487 P.2d 697

Alan D. FRANDSEN, Plaintiff and Respondent,

v.

Gene GERSTNER and Zelda Gerstner, his wife, Defendants, Third-Party Plaintiffs and Appellants,

v.

MT. OLYMPUS REALTY, INC., a Utah corporation, Third-Party Defendant and Respondent.

No. 12134.

Supreme Court of Utah.

July 19, 1971.

Gifford W. Price, and J. Thomas Greene, of Cannon, Greene & Nebeker, Salt Lake City, for appellants.

Alan H. Bishop, Salt Lake City, for Alan D. Frandsen.

James P. Cowley and Robert D. Maack, Salt Lake City, for Mt. Olympus Realty Co.

CALLISTER, Chief Justice:

Plaintiff was awarded a decree of specific performance in accordance with an earnest money receipt and offer to purchase which he had executed as a written offer to Gene and Zelda Gerstner, the owners of the Millcreek Inn, a restaurant. Defendants pleaded a counterclaim and a third-party claim against Mt. Olympus Realty Company, which in turn pleaded a counterclaim against the Gerstners for a real estate commission. At the conclusion of the trial, before a jury, the trial court granted plaintiff's motion for a directed verdict in his favor and against defendants and further granted third-party defendant's motion for a directed verdict in its favor and against third-party plaintiff.[1] Plaintiff and third-party defendant were awarded $1000 attorney's fees and costs. The Gerstners appeal and urge that their motion to dismiss plaintiff's complaint and third-party defendant's counterclaim should be granted as a matter of law and that their counterclaim and third-party complaint should be remanded for further proceedings. In the alternative, Gerstners assert that the entire matter should be remanded for a new trial.

Gene and Zelda Gerstner, husband and wife, were contract purchasers of Millcreek

1. The apparent phraseology of the directed verdicts was intended to deny defendants' counterclaim against plaintiff and defendants' third-party claim against Mt. Olympus Realty.

Inn, which is located on Forest Service property upon which a special use permit had been issued. They were purchasing the property from one L. D. Hudson under an agreement of sale. The Gerstners operated the restaurant for several years and resided on the premises. Subsequently, they moved to California. In 1965 they listed the property for sale for $40,000; they were unsuccessful in selling it. In 1969 they requested Gene's mother to contact Ted A. Hultquist of Mt. Olympus Realty, the agent with whom they had previously listed the property.

There was a dispute as to whether the Gerstners previously telephoned Mr. Hultquist to inform him that the senior Mrs. Gerstner would execute the listing agreement. Nevertheless, Mrs. Gerstner went to the broker's office and signed the agreement, upon which third-party defendant claims a real estate commission of $1230, attorney's fees and costs. This listing agreement empowered the broker to find a party who was ready, able and willing to buy the property at the price and terms listed or any other terms to which the vendor might agree in writing; in return for which the vendor agreed to pay a commission of six per cent. This standard form agreement recited that the signer had marketable title, would prorate certain expenses, and in the event of sale would provide a proper conveyance.

The senior Mrs. Gerstner signed her name under the blank designated Owner-Husband; the remaining space, designated Owner-Wife, was left unfilled. The face of the document clearly indicated that Gene Gerstner was the owner. The Gerstners claim that they have never received a copy of the listing agreement. The realty company asserts that Gerstners subsequently ratified the listing agreement.

On June 2, 1969, plaintiff submitted on a standard form an earnest money receipt and offer to purchase, wherein he offered a total purchase price of $20,500. Plaintiff deposited $500 and offered to pay $2,500 when the sellers approved the sale; $2,000 within 30 days from closing; assume the existing mortgage of approximately $8,500; grant the sellers a first mortgage of $7,000 on a home located in Salt Lake City; pay the balance of $7,000 periodically at the rate of $7\frac{1}{2}$ per cent interest per annum on the unpaid balance; and negotiate his own property lease with the Forest Service.

The offer further recited that all equipment appurtenant to operation of the Inn should be included as part of the property purchased.[2] The offer further specified that an inventory would be attached and made a part of the agreement.

This standard form further recited:

This payment is received and offer is made subject to the written acceptance

2. The trial court included these terms in its order to Gerstners to convey.

of the seller endorsed hereon within _____ days from date hereof, and unless so approved the return of the money herein receipted shall cancel this offer without damage to the undersigned agent.

\*   \*   \*   \*   \*   \*

It is understood and agreed that the terms written in this receipt constitute the Preliminary Contract between the purchaser and seller, and that no verbal statement made by anyone relative to this transaction shall be construed to be a part of this transaction unless incorporated in writing herein.

The form further provided that if either party failed to fulfill the terms and conditions of the agreement, he agreed to pay all expenses of enforcing the agreement, including a reasonable attorney's fee. Finally the form specified that the seller agreed in consideration of the efforts of the agent in procuring a purchaser to pay the agent a specified real estate commission.

Two agents of Mt. Olympus Realty, John Hyde and Ken Prothero, testified that they jointly telephoned Gene Gerstner in California, informed him of the earnest money receipt, and read him the terms of the offer. They instructed him that if the offer were acceptable, to telegraph an acceptance, and they dictated the essential terms. Mr. Gerstner testified that he conversed solely with John Hyde, that nothing

was read to him, that he was not informed of the $500 deposit, and that Hyde represented that plaintiff Frandsen had made an offer to purchase the Inn for $3,000 down, $2,000 within 30 days, an assumption of the L. D. Hudson's mortgage, and a mortgage to the Gerstners on some rental property. Hyde further instructed him that he must respond within 24 hours and dictated the language to be used in the telegram.

Gerstner discussed the matter with his wife and later in the evening sent the following telegram:

> Offer made on June 2, 1969 by Allen D. Frandsen for Mill Creek Inn is accepted terms $3,000 down $2,000 within 30 days assumption of L. D. Hudson mortgage and first mortgage to Gene Gerstner for $7,000 on buyers rental property.
>
> Gene and Zelda Gerstner

The telegram was sent to John Hyde of Mt. Olympus Realty. Defendant Gerstner testified that the telegram did not represent the terms upon which he was willing to sell, and the next morning he telephoned John Hyde. Hyde first denied the call and then later admitted it could have occurred; Gerstner's telephone bill verified that a call was made. Gerstner testified that he instructed Hyde that he wanted the Inn as a security interest, that he wanted L. D. Hudson paid off by the purchaser to assure the priority of Gerstners' interest, that he

had arranged a discount of approximately $1,200 with Hudson, and that Gerstners wanted the benefit of the discount, i. e., the sale price would remain constant but the balance of the purchase price to be received by Gerstners would be increased by the discount granted by Hudson, when the buyer discharged the Gerstners' obligation under the prior sale agreement. Hyde further agreed that Gerstner would prepare the inventory when he arrived in Salt Lake.

There was a dispute as to whether Gerstner talked with Hyde prior or subsequent to Hyde's contacting plaintiff to inform him that he had bought a restaurant. Hyde received a telephonic communication of the telegram on the 3d of June; he received a written copy on the 4th. Hyde testified that he did inform plaintiff that Gerstner wanted a security interest on the Millcreek property, rather than on plaintiff's rental property.

When the written telegram arrived on the 4th of June, Ken Prothero attached it to the earnest money agreement and wrote the following thereon:

Accepted as per terms of Telegram a copy of which is attached hereto and by reference made a part hereof.

Mt. Olympus Realty. Ken Prothero —agent.

Defendants arrived in Salt Lake City, and Gene Gerstner went to the real estate office on June 16, 1969, where he observed the written documents for the first time. The purchaser had arranged a collateral assignment of the Inn as a substitute for the mortgage on his rental property. Defendants refused to execute the agreements because they did not contain the terms they had specified. The parties subsequently attempted to reconcile their differences, but to no avail. Plaintiff purchased the Hudsons' interest in the property for $7,800 but he denied the discount claimed by defendants and as Hudsons' successor in interest asserted that they owe him an unpaid balance of $8,783.46. Plaintiff then initiated this action for specific performance, and the trial court ordered defendants to perform the agreement entered into between the parties on June 3, 1969.

■ The trial court was evidently of the opinion that from the time agent Hyde notified plaintiff by telephone of the acceptance of Gerstners, there was hencefore a binding contract of sale. Under basic contract theory, generally a contract arises from the time that the agent of the offeree communicates the acceptance of his principal to the offeror.[3] These general rules, however,

---

3. See Restatement of Contracts, § 64, Illustration 2. "A makes B an offer by mail, or messenger, and B promptly sends an acceptance by his own servant or agent. There is no contract until the acceptance is delivered by the servant or agent to the offeror, or some person authorized to receive it on his behalf."

may be modified by the express terms of the offer. "If the offeror prescribes the only way in which his offer must be accepted, an acceptance in any other way is a counter-offer. * * *"[4]

In the instant case, the offer specified that no verbal statement made by anyone relative to this transaction should be construed to be a part of this transaction unless incorporated in writing herein and that the offer was subject to written acceptance of the seller endorsed thereon.

▌ Since the offer specified the exclusive manner of acceptance, there was no acceptance unless the sellers or their agent endorsed their acceptance on the earnest money receipt. Plaintiff may not at his option waive this defect in the acceptance.

An offeror who receives an acceptance which is too late or which is otherwise defective, cannot at his election regard it as valid. The late or defective acceptance is a counter-offer which must in turn be accepted by the original offeror in order to create a contract.[5]

Defendants have never endorsed their acceptance on the offer; but was Ken Prothero's endorsement, as their agent, binding? Defendants pleaded the Statute of Frauds, Sec. 25–5–3, U.C.A.1953, which provides:

Every contract * * * for the sale, of any lands, or any interest in lands, shall be void unless the contract, or some note or memorandum thereof, is in writing subscribed by the party by whom the lease or sale is to be made, or by his lawful agent thereunto authorized in writing.

▌ The listing agreement (which was never subscribed by the parties to be charged) empowered the realtor to find a party, who was ready, able and willing to buy for the terms and price at which the vendors might agree in writing. Assuming, but not conceding, the listing agreement was not void, the document did not authorize the broker in writing to execute a contract of sale on behalf of his principals.

Thus the authority of a real-estate broker with whom lands are listed for sale does not extend to the signing of a contract of sale. The power to execute a contract of sale is an additional authority that must be expressly granted in writing.

It follows that, when the owner of real estate executes and delivers written authority to his broker for the sale of real estate and the instrument contains no further or additional authority than

---

4. Restatement of Contracts, § 61, ·Comment a, p. 67.

5. Restatement of Contracts, § 73, pp. 79–80; also see 1 Williston on Contracts (3d Ed.) § 92, pp. 335–336.

is common to such brokers, the broker has no authority to sign a contract for the owner. [Citation] [6]

The terms of the telegram do not expressly or impliedly grant authority to Ken Prothero to execute the contract of sale on behalf of the Gerstners. We are compelled to conclude that defendants were never bound by the terms of the earnest money agreement, and the trial court erred in decreeing specific performance of this agreement. The third-party defendant's counterclaim for a real estate commission was premised on a provision in the earnest money agreement, which assertedly ratified the listing agreement. Since defendants were not bound by the earnest money agreement, they were not, as a matter of law, liable to pay the commission.[7]

In regard to defendants' counterclaim, a survey of the record reveals insufficient evidence to support any of their three causes of action; the trial court properly granted a directed verdict. Defendants' third-party claim against Mt. Olympus Realty was contingent upon defendants' liability to plaintiff, which this opinion has denied.

The judgment of the district court granting plaintiff specific performance and third-party defendant a real estate commission, their attorney's fees and costs is reversed. The judgment of the trial court, directing verdicts against the defendants on their counterclaim and third-party claim, is affirmed. Costs are awarded to defendants.

TUCKETT, HENRIOD, ELLETT and CROCKETT, JJ., concur.

---

6. Queen City Lumber Co. v. Fisher, 111 N.W.2d 714, 716 (N.D.1961); also see 43 A.L.R.2d 1015–1017, Anno.: Broker's Authority To Contract.

7. See 3 Am.Jur.2d, Agency, § 163, p. 551: "While in most instances no particular formality is required for ratification, and it may be oral as well as written, implied as well as express, ratification must to bind the principal, be in writing if the original authorization was required to be in writing, and this principle applies to cases where the original authorization was required to be in writing under the statute of frauds. * * *"