Roger SOLLENBARGER, Raleigh K. Gardenhire, Charles Wheeler and Peter Naumburg, for themselves and all others similarly situated, Plaintiffs,

v.

MOUNTAIN STATES TELEPHONE AND TELEGRAPH CO., d/b/a Mountain Beil, a Colorado corporation, Defendant.

Civ. A. No. 87–1485–SC.

United States District Court,
D. New Mexico.

Aug. 15, 1988.

George Gary Duncan, Duncan & Gabell, Santa Fe, N.M., Robert J. Dyer, III, Stutz, Dyer, Miller & Delap, Denver, Colo., for plaintiffs.

Seth D. Montgomery, Victor R. Ortega, Bradford V. Coryell, Montgomery & Andrews, P.A., Santa Fe, N.M., Dale Harris, Carole Jeffery, Davis, Graham and Stubbs, Denver, Colo., for defendant.

## OPINION AND ORDER

THEIS, District Judge.

This matter comes before the court on plaintiffs' motion for certification of a plaintiff class under Fed.R.Civ.P. 23(b)(3) and defendant's motion to dismiss plaintiffs' pendent state law claim. The proposed class includes all present and past customers of Mountain Bell ("MB") who contracted for inside wire maintenance service ("IWMS") between 1982 and the present. Dkt. no. 47, ¶ 8(a). Plaintiffs contend MB monopolized IWMS in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, and that IWMS contracts are void or voidable under state contract law. The maintenance contracts at issue cover the wire that runs from the exterior of a house, through the walls, to the phone jack on an interior wall where the customer plugs a phone in. The court received extensive briefs and exhibits and heard oral arguments on the class certification question. The court denied, though, MB's request for an evidentiary hearing on class certification. Dkt. no. 77. The court is now prepared to rule on the pending motions.

A short history of IWMS litigation against MB is helpful background information. In fall 1987, the state of Colorado filed suit against MB over the sale of IWMS in Colorado; the case quickly settled. Dkt. no. 47, ¶ 9(b)(4); Dkt. no. 51, ¶ 6. Plaintiffs filed the instant suit in New Mexico as a class action on behalf of New Mexico MB IWMS customers in December 1987. The complaint included state and federal antitrust, voidable contract, fraud and New Mexico statutory consumer protection counts. Dkt. no. 1. Two months later, plaintiffs amended their complaint: they expanded the geographic scope of the suit from New Mexico to all seven states MB operates in (Arizona, Colorado, Idaho, Montana, New Mexico, Wyoming, Utah); they expanded the class definition from those who contracted for IWMS by the negative option method (described below) to all IWMS customers; they dropped the state antitrust and consumer protection law counts; they retained the federal antitrust and pendent state law fraud and voidable contract claims. Dkt. no. 18. The court granted the motion to file the first amended complaint. Dkt. no. 45. The court granted MB's motion, however, to stay discovery on the seven state class action prior to class certification. *Id.* at 13. Plaintiffs' counsel filed state statutory and common law actions in three of the seven states, New Mexico, Colorado, and Montana, in late 1987 or early 1988 to toll the statute of limitations in those states. Tr. of Oral Argt. at 25.

IWMS contracts are a by-product of the deregulation of the telephone industry. Prior to 1982, MB, like all regional telephone companies, provided all facets of phone service and billed the customer with a single, monthly charge. The one charge included an amount for MB's maintenance of the inside wire; however, the monthly bill did not break out the components of the single monthly charge. After a 1982 FCC order, all regional phone companies had to terminate some types of phone services, repairing phones for instance, while other services, like IWMS, became *optional* for customers. Phone customers could contract with MB for IWMS, do the work themselves or hire a third party to service the inside wire. Plaintiffs allege MB devised a plan to monopolize IWMS contracts and continue to provide IWMS to its customers, despite the optional nature of the service. Dkt. no. 47 at ¶¶ 16–30.

The named plaintiffs are four New Mexico residents who began phone service prior to 1982 and allegedly were victims of the first phase of MB's alleged monopolization plan. All plaintiffs assert they initially contracted with MB for IWMS via the "negative option" or "opt out" method.

Sollenbarger Depo. at 7–9; Naumburg Depo. at 16; Wheeler Depo. at 12, 61; Gardenhire Depo at 14–15. MB sent out negative option notices to its customers in the seven states with the monthly billing statement in late 1982 or early 1983. The labels, negative option and opt out, describe the choice MB gave its customers in the notice: you will continue to have an IWMs contract unless you notify us that you do not want an IWMS contract.

Plaintiffs assert the opt out contract is void or voidable and part of MB's monopolistic conduct because: (1) customers contracted for IWMS if they did nothing; (2) MB knew that few customers would read the notice MB sent with the regular monthly billing, and MB would retain a dominant share of IWMS contracts; (3) if a customer read the notice, it did not adequately convey the optional nature of the service or provide IWMS contract terms. Dkt. no. 47 at ¶¶ 17–19.

Three of the four class representatives, Sollenbarger, Naumburg, and Wheeler, allege injury from the second and ongoing pattern of reportedly illegal conduct by MB. Plaintiffs contend MB maintains its monopolistic control over IWMS contracts with *new* customers and those who change service (hereinafter "movers") by failing to disclose material information about IWMS in its oral representations to movers when they begin phone service with MB. *Id.* at ¶ 21. These three plaintiffs changed service at some time after the negative option sale and had personal contact with an MB customer service representative. The three named plaintiffs remember conversations with customer representatives but do not recall questions about IWMS. Sollenbarger Depo at 16–17, 54 ("well, typically, I'm the kind of guy that would not order a maintenance contract."); Wheeler Depo. at 66, 69–76; Naumburg Depo. at 18–21, 28, 52 (Naumburg is a real estate broker and called MB a number of times.).

All four named plaintiffs participated in the third phase of MB's allegedly illegal conduct. Between 1982–87, state utility regulatory commissions had authority to regulate IWMS. After January 1, 1987, an FCC order completely deregulated IWMS. In late 1986 or early 1987 MB informed all of its customers, except Montana customers, about the end of government regulation over IWMS and that MB would send IWMS agreements to them in a short time. Dkt. no. 67 at 9, ¶¶ 11–13. Plaintiffs allege MB failed to send out the promised agreements until late in the next year, continued to use the negative option sales method and failed to provide material information in the contract it did sent out. Dkt. no. 47 at ¶¶ 23–29.

Plaintiffs' second and third counts arise under state voidable contract and fraud law. The state law counts allegedly arise from the same facts that support the monopolization claim of count I. Dkt. no. 47, Counts II and III; Tr. of Oral Argt. at 22 ("We've got identical facts for both claims."), 27.

MB's answer to the first amended complaint denied the substantive allegations of plaintiffs' complaint. Dkt. no. 51 at ¶¶ 1–22. MB counterclaimed on an unjust enrichment theory. MB contends that if a plaintiff class is certified and liability is ultimately assessed against MB, it should receive a set off against each plaintiff's recovery for the value of the service calls it actually performed. *Id.* at 9–10.

After addressing both the voidable contract and fraud claims in its two briefs on class certification, Dkt. nos. 33 & 73, plaintiffs' counsel apparently abandoned the fraud claim at oral argument. Counsel relied exclusively on contract law that allows a party to void a contract previously entered into because of material omissions in the contract terms, Restatement (Second) of Contracts §§ 159, 160, 162–164, 167; 12 *Williston on Contracts* § 1515 at 480, § 1515C at 495 (W. Jaeger ed. 1970). Tr. of Oral Argt. at 17, 71–72. Counsel also stated, "it's not an active fraud case, its a concealment case, and it's concealment in relationship to inducement of a contract." *Id.* at 19 and 14–15. Plaintiffs also relied exclusively on the contract theory in its response to the Motion to Dismiss the Pendent Claims. The court's analysis of the state law claim proceeds on the theory ad-

vocated by counsel at and after oral argument.

The court will address the documentary evidence submitted by the parties in various sections below.

## I. CLASS ACTION PRINCIPLES

A class action suit is a unique procedural device to efficiently litigate issues common to a large number of parties. The Supreme Court recently explained the purpose of class action suits:

> The class-action device was designed as 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.' *Califano v. Yamansaki,* 442 U.S. 682, 700–701 [99 S.Ct. 2545, 2557, 61 L.Ed.2d 176 (1979)]. Class relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.' *Id.,* at 701 [99 S.Ct. at 2557]. For in such cases, 'the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23.'

*Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 155, 102 S.Ct. 2364, 2369, 72 L.Ed.2d 740 (1982) (citations omitted).

■ The trial judge's task in reviewing a motion to certify a class is to "concentrate on the facts at the core of the dispute and determine the common legal and factual basis, if any, of the controversy without addressing the merits." *Thompson v. Midwest Found. Indep. Physicians Ass'n.,* 117 F.R.D. 108, 109 (S.D.Ohio 1987). The district judge cannot rule on the merits of the controversy when examining a Rule 23 motion. "We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action. Indeed, such a procedure contravenes the Rule...." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156,

177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974).

The district court cannot divorce itself, however, from the plaintiff's cause(s) of action. The decision on class certification "involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Falcon,* 457 U.S. at 160, 102 S.Ct. at 2372 (citations omitted). The trial judge must "rigorously" scrutinize plaintiffs' various claims and consider if they are amenable to adjudication on a class-wide basis. *Falcon,* 457 U.S. at 161, 102 S.Ct. at 2372; *McCarthy v. Kleindienst,* 741 F.2d 1406, 1412 n. 6 (D.C.Cir.1984); *Joseph v. Gen. Motors Corp.,* 109 F.R.D. 635, 638 (D.Colo.1986).

■ The district judge enjoys a wide amount of discretion when evaluating whether a suit should proceed as a class action. The Tenth Circuit explained that "(w)hether a case should be allowed to proceed as a class action involves intensely practical considerations, most of which are purely factual or fact-intensive. *See [United States Parole Comm'n v.] Geraghty,* 445 U.S. [388,] at 402–03 [100 S.Ct. 1202 at 1211–12, 63 L.Ed.2d 479] [ (1980) ]. Each case must be decided on its own facts, on the basis of 'practicalities and prudential considerations.' *Id.* at 406 n. 11 [100 S.Ct. at 1213 n. 11]." *Reed v. Bowen,* 849 F.2d 1307, 1309 (10th Cir.1988).

The decision to certify a class is not set in stone; the trial court retains the power to decertify or modify the class at any time prior to final judgment. Fed.R.Civ.P. 23(c)(1) ("An order under this subdivision ... may be altered or amended before the decision on the merits."); *Falcon,* 457 U.S. at 160, 102 S.Ct. at 2372 ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." (footnote omitted)); *In re School Asbestos Litigation,* 789 F.2d 996, 1011 (3rd Cir. 1986) ("[A] district court must necessarily enjoy wide discretion, and we are not inclined to reverse a certification before the district judge has had an opportunity to put the matter to a test. We point out the critical fact that certification is conditional.

When, and if, the district court is convinced that the litigation cannot be managed, decertification is proper."), *cert. denied,* 479 U.S. 852, 915, 107 S.Ct. 182, 318, 93 L.Ed. 2d 117, 291 (1986).

Plaintiffs must demonstrate that the requirements of Fed.R.Civ.P. 23 are satisfied. *Rex v. Owens ex rel. Oklahoma,* 585 F.2d 432, 435 (10th Cir.1978); *Albertson's, Inc. v. Amalgamated Sugar Co.,* 503 F.2d 459, 463 (10th Cir.1974). All class actions must satisfy the prerequisites of Rule 23(a):

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable ["numerosity"], (2) there are questions of law or fact common to the class ["commonality"], (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ["typicality"], and (4) the representative parties will fairly and adequately protect the interests of the class ["adequacy"].

Fed.R.Civ.P. 23(a).

The putative class must also satisfy one of the provisions of Rule 23(b). Plaintiffs assert compliance with Rule 23(b)(3):

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, ["predominance"] and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy ["superiority"]. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action ["managability"].

Fed.R.Civ.P. 23(b)(3).

## II. CLASS CERTIFICATION

Several of the Rule 23(a) requirements are not in dispute. First, the numerosity criterion is not challenged by MB. Plaintiffs estimate the seven state class includes at least three million current MB customers and an unknown number of past customers. Fed.R.Civ.P. 23(a)(1) is satisfied. Second, the competence of plaintiffs' counsel is not questioned by MB or the court. Dkt. no. 33, Ex. C (affidavits of class counsel). Competence of counsel is one portion of the Rule 23(a)(4) adequacy test. *Secretary of Labor v. Fitzsimmons,* 805 F.2d 682, 697 (7th Cir.1986); *Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468, 472 (5th Cir.1986) ("The 'adequacy' requirement looks at both the class representatives and their counsel.").

■ The court also finds that some of the requirements of Rule 23(a) are subsumed within other provisions of the Rule; therefore, the court need not discuss them in separate sections to faithfully and fully examine the entire class certification issue. First, Professors Wright, Miller and Kane approve of reviewing the Rule 23(a)(2) commonality question while analyzing the Rule 23(b)(3) question of predominance of common issues to the class and named representatives. They explain: "(A)n action is maintainable under Rule 23(b)(3) only if there is a finding that common questions predominate over individual issues. Since this obviously is a more stringent standard than that prescribed by Rule 23(a)(2), subdivision (a)(2) would be satisfied any time the court finds that the subdivision (b)(3) test is met." 7A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 1763 at 227 (2d ed. 1986) (hereinafter *Federal Practice*). The court will address the commonality arguments within the Rule 23(b)(3) discussion.

The second merger of tests within Rule 23(a) involves the (a)(3) requirement of typicality and the (a)(4) requirement that the named representative adequately represent the entire class. *See Falcon,* 457 U.S. at 157 n. 13, 102 S.Ct. at 2370 n. 13. The tests merge because " '[i]f the representatives' claims are not typical of the class, they cannot adequately protect the inter-

ests of the absent class members.' " *Spivak v. Petro–Lewis Corp.*, 118 F.R.D. 504, 509–10 (D.Col.1987) (citing *Kas v. Financial Gen. Bankshares, Inc.*, 105 F.R.D. 453, 461 (D.D.C.1984)). The court finds *Falcon* and *Spivak* persuasive and will not burden this lengthy opinion with a repetitive section. The court will focus on the subdivision (a)(3) test.

## A. MONOPOLIZATION CLAIM

■ MB attacks the antitrust count with three typicality arguments. Dkt. no. 67 at 17–27. The typicality requirement "assures that the claims of the representative party are similar enough to the claims of the class so that he will adequately represent them." 7A *Federal Practice* § 1768 at 232–33. The class representative must " 'possess the same interest and suffer the same injury' as the class members." *East Texas Motor Freight System Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (citation omitted). The similarity in interests between the representative parties and the rest of the class insures an absence of conflict between the two groups. *In re Texas Int'l. Sec. Litig.*, 114 F.R.D. 33, 44 (W.D.Okla.1987). The existence of significant antagonistic interests between the representatives and the class would defeat class certification. *Albertson's Inc. v Amalgamated Sugar*, 503 F.2d 459, 463 (10th Cir.1974). The claims of the representative and the class need not be *identical*, though; different fact patterns or amounts of damages will not necessarily defeat typicality. *Texas Int'l. Sec. Litig.*, 114 F.R.D. at 44; *Joseph v. Gen. Motors Corp.*, 109 F.R.D. 635, 640 (D.Col.1986); 7A *Federal Practice* § 1764 at 235–41.

■ A Sherman Act monopolization claim plaintiff must show that the defendant had (1.) monopolization power, (2.) over the relevant geographic and product market, (3.) gained by exclusionary or anti-competitive means that (4.) causes an injury cognizable under antitrust law. 15 U.S.C. §§ 2, 15; *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966).

MB's first typicality argument attacks the relevant market requirement. MB contends the relevant market is not the seven state region or even the seven separate states MB serves. Instead, MB insists at least 200 relevant markets exist within the seven states. MB's theory is that the relevant market area is localized. A competing IWMS company could only provide efficient and effective service to each large town in the region or portions of a metropolitan area. Hence, MB divides the seven states into 200 relevant markets based on centers of population.

■ MB proffered an expert witness to explain their relevant market theory to the court. Dkt. nos. 59, 72. The court denied an evidentiary hearing on this point because the relevant market, either geographic or product, is almost exclusively a fact question for the jury. Dkt. no. 77 at 3; *Westman Comm'n. Co. v. Hobart Int'l. Co.*, 796 F.2d 1216, 1220 (10th Cir.1986); *Cackling Acres, Inc. v. Olson Farms, Inc.*, 541 F.2d 242, 245–6 (10th Cir.1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977); *Telex Corp. v. Int'l. Business Mach.*, 510 F.2d 894, 915 (10th Cir.1975) (per curiam), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975); *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co.*, 661 F.Supp. 1448, 1463 (D.Wyo.1987); *Assoc. of Indep. Television Stations, Inc. v. College Football Assoc.*, 637 F.Supp. 1289, 1300 (W.D.Okla.1986); ABA Antitrust Section, *Antitrust Law Developments* 113–14 (2d ed. 1984).

■ The court feared that at an evidentiary hearing the parties would have marshaled a "battle of the experts" on the relevant market issue. A fact specific documentary hearing would switch the court from the permissible inquiry of seriously examining plaintiffs' legal theory in the context of class action litigation, as required by *Falcon*, into the impermissible realm of a mini-trial on a merits issue that is precluded by *Eisen*. The testimony proffered by MB would have gone to the heart of an issue that could completely eliminate the monopolization claim and remove the jurisdictional basis for the voidable con-

tract claim. Plaintiffs would have had to vigorously defend the relevant market point to prevent a total dismissal of their suit. The court could not countenance this scenario in light of *Eisen* and the stay on merits discovery.

Moreover, plaintiffs' claim of a single market of seven states or seven markets defined by state boundaries is colorable under existing law and facts. In two different cases, the Supreme Court approved nationwide or regional relevant market determinations in situations where the defendant provided localized service. *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). The *Grinnell* Court considered an allegation of monopolization of fire and police alarm service stations. The stations were the sole, centralized receiving points for fire and police alarms in cities across the country. The Court approved the district court's finding of a national relevant market:

> The activities of an individual station are in a sense local as it serves, ordinarily, only that area which is within a radius of 25 miles. But the record amply supports the conclusion that the business of providing such a service is operated on a national level. There is national planning. The agreements we have discussed covered activities in many States. The inspection, certification and rate-making is largely by national insurers. The appellant ADT [a Grinnell Corp subsidiary with a 73% share of the national market] has a national schedule of prices, rates, and terms, though the rates may be varied to meet local conditions.

*Grinnell Corp.*, 384 U.S. at 575, 86 S.Ct. at 1706.

The *Otter Tail* Court let stand the jury's conclusion that a three state relevant market existed. 410 U.S at 369–70, 93 S.Ct. at 1025–26. Otter Tail Power Company competed in 510 towns within its multistate relevant market against the local municipal power entities and nearby rural electric cooperatives for the exclusive rights to re-

tail electricity in the municipality. *Id.* The numerous local arenas of competition did not defeat a regional definition of the relevant market.

Plaintiffs' limited discovery on this merits issue has produced some probative documents. While MB argues that there are 200 relevant markets, it analyzes IWMS participation on a state-wide basis, Dkt. no. 31, Ex. C (79% participation rate for each state MB services in a April 13, 1984 memo), or a region-wide basis, Dkt. no. 73, Ex. H at 0033709 ("Presently [October 1984], about 80% of our residence customers have a basic wire maintenance plan with Mountain Bell."). When discussing the problems of notifying IWMS subscribers about the complete deregulation of IWMS, an MB manager described MB activity by states, not by smaller regions. Dkt. no. 73, Ex. J. MB's Idaho general counsel described legal problems in state-wide terms. Dkt. no. 33, Ex. D.

In short, MB's state or region-wide activity, even with numerous local service outlets, may fall within the parameters of *Grinnell Corp.* or *Otter Tail*. The court at this juncture cannot and should not determine this point. *Foltz v. U.S. News & World Report, Inc.*, 106 F.R.D. 338, 341 (D.D.C.1984) ("In view of the fact that the plaintiffs have presented a colorable case on the merits, the sufficiency of their fraud allegations does not enter into the class certification equation."); *In re Indep. Gasoline Antitrust Litig.*, 79 F.R.D. 552, 561 (D.Md.1978) ("The possibility that plaintiffs will not be able to prove their allegations at trial is not a proper basis for denying class certification." (citations omitted)).

MB's legal authority on this point is inapposite. MB cites three cases for the unremarkable proposition that if numerous local markets exist the court could not certify a class because the class members from each market would have antagonistic interests. Dkt. no. 67 at 21. The cited cases are easily distinguishable. This court is not faced with readily apparent, distinct relevant markets such as the "36 warehouses [auction barns] in 11 geographic markets" that the court considered in *Windham v.*

American Brands, Inc., 565 F.2d 59, 62 (4th Cir.1977) (en banc), *cert. denied*, 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1977), or the exclusive franchise territory agreements between the defendant brewers and their wholesalers in *Vasiliow Co. v. Anheuser–Busch, Inc.*, 117 F.R.D. 345, 347 (E.D.N.Y.1987).

In *Abrams v. Interco Inc.*, 719 F.2d 23, 29–30 (2d Cir.1983), plaintiffs did not allege a pattern of price fixing in their proposed nationwide consumer class action. Without an allegation of anti-competitive conduct common to all plaintiffs or significant guidance from the trial court on its reasons for rejecting class certification, the *Abrams* court concluded innumerable local markets existed for the 3500 dealers of consumer items like Florsheim shoes and London Fog coats. *Id.* at 30–31. The court is confronted here with allegations of a region-wide monopolization plan, for *one* product and an easily identified plaintiff class.

■ MB's second antitrust typicality argument concerns the "antitrust injury" prong of a monopolization claim. MB cites to and quotes from several cases that enunciate a standard definition of the type of injury a monopolization plaintiff must suffer, i.e.: an "injury of the type the antitrust laws were intended to prevent...." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488–89, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); Dkt. no. 67 at 25. If MB is implicitly arguing that plaintiffs have not suffered an injury covered by § 4 of the Clayton Act, 15 U.S.C. § 15, MB is incorrect. The Court in *Reiter v. Sonotone Corp.*, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), not cited by MB, expressly resolved any doubt that customers could suffer an antitrust injury. The *Reiter* Court explained:

> (M)onetary injury, standing alone, may be injury in one's 'property' within the meaning of § 4 [of the Clayton Act, 15 U.S.C. § 15]. Thus, the fact that petitioner Reiter was deprived of only money, albeit a modest amount, is no reason to conclude that she did not sustain a 'property' injury.

> Nor does her status as a 'consumer' change the nature of the injury she suffered or the intrinsic meaning of 'property' in § 4. That consumers of retail goods and *services* have standing to sue under § 4 is implicit in our decision in *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 780, 782 [95 S.Ct. 2004, 2009, 2010, 44 L.Ed.2d 572] (1975).

*Reiter*, 442 U.S. at 340–41, 99 S.Ct. at 2331–32 (emphasis added). A consumer antitrust class action that seeks to recover money is permissible. 15 U.S.C. § 15.

The more obvious thrust of MB's typicality argument is that if the plaintiff class is splintered into 200 relevant markets, the antitrust injury to members of the class is not identical and typicality is shattered. Dkt. no. 67 at 26. MB's argument hinges on the court accepting its relevant market theory. The court did not decide the relevant market question; MB's antitrust injury argument founders on this rocky, unresolved question. Additionally, as explained below, see p. 429, the possibility that plaintiffs could recover different amounts of damages does not destroy typicality. Dkt. no. 67 at 26–7, pts. 3 & 4.

■ MB also asserts that its state action *affirmative* defense precludes class certification under the typicality test. Dkt. no. 67 at 21–4. The state action defense shields anti-competitive conduct by private parties when state policy condones the conduct and the state actively supervises the conduct. *Patrick v. Burget*, — U.S. —, —, 108 S.Ct. 1658, 1661, 100 L.Ed.2d 83 (1988). (citations omitted). The state action defense raises a common question of law with a single standard to the entire seven state proposed class; it is not particular to any one state or potential subgroup, like movers. MB is correct that the defense *may* eliminate some states from the class for the period prior to the end of government regulation, December 31, 1986. Dkt. no. 51 at 7; Dkt. no. 67 at 24. MB's ability to raise a potentially valid *defense* in some or all of the states for a significant but finite portion of time is not an obstacle to class certification, though. The defense *may* cause the composition of the class to

change singificantly at some later date but this does not alter the class certification inquiry. The claims of the named representatives are typical of the class.

MB does not challenge any of the remaining elements of Rule 23 concerning the monopolization count. The court independently finds that Rule 23(b)(3) is met. The common questions of law, the elements of the monopolization claim fully enumerated and partially discussed above, dwarf, rather than merely predominate over, any individual questions. Second, the class action is a superior vehicle for this suit. The court agrees with the Supreme Court's percipient observation:

> "The aggregation of individual claims in the context of a class-wide suit is an evolutionary response to the existence of injuries unremedied by the *regulatory* action of government.' Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class action device."

*Deposit Guaranty Nat'l. Bank v. Roper,* 445 U.S. 326, 339, 100 S.Ct. 1166, 1174, 63 L.Ed.2d 427 (1980) (emphasis added). The monopolization claim is a suitable Fed.R. Civ.P. 23(b)(3) class action.

## B. VOID OR VOIDABLE CONTRACT CLAIM

### 1. Conflicts in State Law

■ Plaintiffs assert one pendent state law claim: the IWMS contracts are void or voidable under the Restatement (Second) of Contracts §§ 159, 160, 162–64, 167. The court's first task is to determine if New Mexico contract law is similar to contract law in the other states in the proposed class. A multistate class action raises constitutional choice of law problems. The due process clause of the fourteenth amendment and the full faith and credit clause of article IV, § 1 of the Constitution are not violated if the law of the forum state "is not in conflict with that of any other jurisdiction connected to this suit." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 816, 105 S.Ct. 2965, 2976, 86 L.Ed.2d

628 (1985). If the laws of the various states involved in the suit are in conflict, the court must then consider if an exercise of personal jurisdiction over the foreign state parties is appropriate. *Shutts,* 472 U.S. at 823, 105 S.Ct. at 2980; *In re Seagate Technologies Sec. Litig.,* 115 F.R.D. 264, 271–72 n. 14 (N.D.Cal.1987); *In re Computer Memories Sec. Litig.,* 111 F.R.D. 675, 686 (N.D.Cal.1986). The court is convinced the laws of the seven states are not in conflict and the personal jurisdiction analysis is not required.

The court's analysis of the multiple state choice of law problem is guided by an opinion of the Supreme Court decided after the parties completed briefing the class certification question. *Sun Oil Co. v. Wortman,* —— U.S. ——, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988). The *Wortman* Court clarified the standard on when *foreign* state law is in sufficient conflict with *forum* state law to violate either the due process clause or the full faith and credit clause. The Constitution is not violated if "a state court misconstrue(s) the law of another State. Rather, our cases make plain that the misconstruction must contradict law of the other State that is clearly established and that has been brought to the court's attention." *Id.* at ——, 108 S.Ct. at 2126. The court reiterated more broadly that "(r)elief cannot be granted in this Court [for constitutional violations because of conflicting state law] unless decisions *plainly contradicting* the Kansas court's interpretations were brought to the Kansas court's attention." *Id.* at n. 4 (emphasis added).

■ The court does not find any "clearly established" or "plainly contradictory" contract law in the foreign states that conflicts with the relevant law of the forum state. Plaintiffs rely on a number of sections of the Restatement (Second) of Contracts to void or make voidable the IWMS contracts because of material omissions of fact in all phases of MB's IWMS operations. The introductory note to the topic, gives an overview of these sections:

> A misrepresentation is an assertion that is not in accord with the facts (§ 159). Concealment (§ 160) and in some cases

non-disclosure (§ 161) of a fact are equivalent to such an assertion. A misrepresentation may have three distinct effects under the rules stated in this Chapter. First, in rare cases, it may prevent the formation of any contract at all (§ 163). Second, it may make a contract voidable (§ 164). Third, it may be the grounds for a decree reforming the contract (§ 166). Restatement (Second) of Contracts at 424 (Introductory Note) (1981).

The New Mexico Supreme Court upheld a trial court's reformation of a contract based on Second Restatement section 166. *Chromo Mountain Ranch Partnership v. Gonzales,* 101 N.M. 298, 300, 681 P.2d 724, 726 (1984). While section 166 is not the remedy provision plaintiffs would prefer, the *Chromo Mountain* court's adoption of the section is solid evidence of the New Mexico court's acceptance of the definitional sections plaintiffs do rely on. Restatement (Second) of Contracts §§ 159-161 (1981). The forum state uses the law plaintiffs rely on.

Other courts within the class area also apply the relevant sections from the Second Restatement of Contracts. *Morris v. Achen Const. Co., Inc.,* 155 Ariz. 512, 514, 747 P.2d 1211, 1213 (1987) (en banc) (the court cited to Restatement (Second) of Contracts § 167 ["When a Misrepresentation Is an Inducing Cause"] in distinguishing two causes of action); *Hampton v. Cowen Agency, Inc.,* 154 Ariz. 14, 15-16, 739 P.2d 1331, 1332-33 (Ct.App.1987) (court reversed summary judgment based on Restatement (Second) of Contracts § 164); *I.M.A., Inc. v. Rocky Mountain Airways, Inc.,* 713 P.2d 882 (Colo.1986) (en banc) (court recognized rescission of a contract based on mistake or misrepresentation, Restatement (Second) of Contracts §§ 153, 164(1)); *Colorado Plasterers' Pension Fund v. Plasterers' Unlimited, Inc.,* 655 F.Supp. 1184, 1186-87 (D.Colo.1987) (Restatement (Second) of Contracts § 163); *Connecticut Gen. Life Ins. Co. v. Dredge,* 746 F.2d 1420, 1425 (10th Cir.1984) (construing Utah law, the court voided a contract based on Restatement (Second) of Contracts § 164(2)), *cert. dismissed,* 478 U.S. 1050, 107 S.Ct. 38, 92 L.Ed.2d 789 (1986); *In re*

*Universal Clearing House Co.,* 77 B.R. 843, 857 (Bankr.D.Utah 1987) (contract invalid under Restatement (Second) of Contracts § 164).

The court was unable to find relevant decisions from three jurisdictions of the proposed class: Idaho, Montana and Utah. The lack of law in these states is not problematic. The law in those states is not "clearly established" or contradictory to the forum state's law; therefore, no violation of the Constitution is possible under the *Wortman* standards. — U.S. at —— & n. 4, 108 S.Ct. at 2126 & n. 4. The court also does not find that the application of certain provisions of the Restatement (Second) of Contracts to the three states is a radical step. The Restatement is widely accepted contract law. *Id.* at —— n. 4, 108 S.Ct. at 2116 n. 4 (the Court referred to "standard contract law" and cited the Restatement (Second) of Contracts); *Robertson v. Clayton Brokerage Co. of St. Louis,* 587 F.Supp. 678, 685 (N.D.Ga.1984) ("It is hornbook law that a party who is induced to enter into a contract on the basis of fraudulent misrepresentations by the other party may treat the contract as voidable. Restatement (Second) of Contracts § 164 (1979)."). An application of plaintiffs' contract law theory to the entire class would not violate the Constitution.

MB relies on Restatement (Second) of Contracts § 69(1)(b) for its defense that the negative option customers intended to contract with MB by their silence. Dkt. no. 67 at 44. This section and its identical predecessor, Restatement of Contracts § 72(1)(b), equate silence with acceptance when (1) the offeror manifests his or her desire to allow assent by silence or inaction and (2) the offeree intends his or her silence or inaction to signify acceptance.

New Mexico and three other states in the MB region have adopted either the relevant First or Second Restatement provision. *United Leasing v. Commonwealth Land Title Agency of Tuscon, Inc.,* 134 Ariz. 385, 389-90, 656 P.2d 1246, 1250-51 (Ct. App.1982); *Vogt v. Madden,* 110 Idaho 6, 8-9, 713 P.2d 442, 444-5 (Ct.App.1985); *Ra-*

ton Wholesale Liquor Co. v. Besre, 49 N.M. 121, 124, 158 P.2d 295, 298 (1945) (Restatement of Contracts § 72); *Garcia v. Middle Rio Grande Conservancy Dist.*, 99 N.M. 802, 807, 664 P.2d 1000, 1005 (App. 1983), ("Silence is acceptance of a contract only when there is a duty to speak.") *cert. denied,* 663 P.2d 1197 (1983); *Russell v. Texas Co.*, 238 F.2d 636, 642 (9th Cir.1956) (Montana law, Restatement of Contracts § 72(2)), *cert. denied,* 354 U.S. 938, 77 S.Ct. 1400, 1 L.Ed.2d 1537 (1957).

The courts in two other states have either adopted a position almost identical to the Restatement (Second) of Contracts § 69(1) or expressed a willingness to adopt § 69. *Brooks Towers Corp. v. Hunkin–Conkey Constr. Co.*, 454 F.2d 1203, 1207 (10th Cir.1972) (applying Colorado law) ("When the relations between the parties justify the offeror's expectation of a reply or where a duty exists to communicate either an acceptance or rejection, silence will be regarded as an acceptance."); *R.J. Daum Constr. Co. v. Child*, 122 Utah 194, 202, 247 P.2d 817, 821 (1952) (the court cites Restatement of Contracts §§ 58–60, which refers to § 72); *Frandsen v. Gerstner*, 26 Utah 2d 180, 185, 487 P.2d 697, 700 (1971) (the court relied on Restatement of Contracts §§ 61, 64 & 73).

The lack of relevant law from Wyoming is not a problem under the constitutional choice of law analysis. First, the Constitution is violated only when clearly established foreign state law conflicts with forum state law. *Wortman,* —— U.S. at ——, 108 S.Ct. at 2126. Second, the two identical Restatement provisions represent the continuous interpretation of contract law by American legal scholars for at least fifty years. MB's law is neither novel nor radical.

An application of the contract law relied on by the parties would not violate the due process clause or the full faith and credit clause. *Wortman,* —— U.S. at ——, 108 S.Ct. at 2126; *Shutts,* 472 U.S. at 816, 105 S.Ct. at 2976.

### 2. Customers Who Used IWMS

▮ MB attacks the contract claim in the same way it attacked the antitrust count: lack of typicality between the representatives and the class members. One distinction MB draws is between IWMS customers who exercised their rights under their IWMS contracts (hereinafter "users") and those who did not, a group which includes all the named plaintiffs. Dkt. no. 67 at 27–30. MB asserts that its unjust enrichment counterclaim for services rendered under the IWMS contracts will consume all of and perhaps in some cases amount to *more* than the users' damages, if plaintiffs win on liability. The users, who may recover a small amount or have to *pay* MB because of the suit, are allegedly in conflict with the named parties, who presumably will recover much more. *Id.*

The court's short response is "that the mere fact that the various members of the class will benefit unevenly is no such conflict as will preclude the maintenance of a class action." *Albertson's, Inc. v. Amalgamated Sugar Co.*, 503 F.2d 459, 464 (10th Cir.1974); *accord In re Texas Int'l. Sec. Litig.*, 114 F.R.D. 33, 44 (W.D.Okla.1987) ("[A] disparity in the damages claimed by the representative parties and the other members of the class" does not defeat typicality.)

Second, MB's argument that users are satisfied customers, Dkt. no. 67 at 28, and thus have interests antagonistic to the disgruntled representatives is remarkably similar to an argument rejected in *Joseph v. General Motors Corp.*, 109 F.R.D. 635 (D.Colo.1986). The car manufacturer in *Joseph* disputed the typicality of a plaintiff class of all owners of certain model cars with allegedly defective engines because some members of the class undoubtedly liked their cars and would not want to sue GM. The *Joseph* court's response is correct: "The mere fact that some class members may not wish to become members of the class or pursue claims against GM does not indicate that their interests are antagonistic to those of the named plaintiffs or the remainder of the class, so that class action treatment would be inappropriate." *Id.* at 640.

The court is sensitive to MB's claim that antagonistic interests between users and

non-users defeats typicality, *Amalgamated Sugar*, 503 F.2d at 463–64, and of the constitutional dimension of this concern, *Hansberry v. Lee*, 311 U.S. 32, 44, 61 S.Ct. 115, 119, 85 L.Ed. 22 (1940). Dkt. no. 67 at 29. The due process problems identified by the Court in *Hansberry*, though, are embodied in the requirements of Fed.R.Civ.P. 23(a)(3) [typicality], (a)(4) [adequacy of representation] and (c)(2) [notice required in (b)(3) class actions]. *Blackie v. Barrack*, 524 F.2d 891, 910 (9th Cir.1975); *See In re Four Seasons Sec. Laws Litig.*, 502 F.2d 834, 842–43 (10th Cir.1974). The court desires to comply with the Constitution and the Rule.

The distinction between this case and *Amalgamated Sugar* and *Hansberry* is the degree and apparentness of the purported conflicts between the representatives and the class. The *Hansberry* class consisted of diametrically opposed groups —one wanted to enforce a racially discriminatory covenant and one did not. *Hansberry*, 311 U.S. at 44, 61 S.Ct. at 119. The *Amalgamated Sugar* facts are closer to this case but not controlling. The plaintiffs in *Amalgamated* were the purchasers of raw sugar from defendant's sugar processing plant, e.g. bakers, food processors and retail grocery chains. 503 F.2d at 461. The *Amalgamated Sugar* court upheld a denial of class certification. The court realized that if it granted plaintiffs' request to change defendant's pricing system from one with eleven zones to a system based on actual miles from defendant's plant, some plaintiffs would immediately get a windfall competitive advantage. *Id.* at 464. The price for raw sugar would vary within the original zone system, based on a plaintiff's location within a zone, and some competitors would instantly have cheaper sugar. The court justified its denial of class certification on the conflicts of interest created by the disparate effects on competition inherent in plaintiffs' case theory. No effect on competition is present in this case and the certainty of extreme disparity in benefits is also not assured.

The parties hotly dispute whether any user would have to return money to MB and the amount that a user's damages would be reduced by a service call. *Compare* MB's view, Dkt. no. 67 at 28, 29 n. 6 *with* plaintiffs' computations, Dkt. no. 73 at 10 n. 7. The court will not wade into this factual morass. Instead, the court adopts the stance taken by other courts that when the facts are more fully developed and a significant conflict between users and the rest of the class is apparent, the court can exclude the users from the class entirely or create a subclass for users. *Roper v. Consurve, Inc.*, 578 F.2d 1106, 1116 (5th Cir.1978), *aff'd, Deposit Guaranty Nat'l. Bank v. Roper*, 445 U.S. 326, 339, 100 S.Ct. 1166, 1174, 63 L.Ed.2d 427 (1980); *In re Indep. Gasoline Antitrust Litig.*, 79 F.R.D. 552, 559 (D.Md. 1978).

### 3. Contracts Formed by the Negative Option Sale and Those Formed Later via Oral Representations

MB asserts the plaintiff class lacks typicality because of the differences in the two broad methods class members used to contract with MB for IWMS: the negative option sale in 1982 and 1983 and thereafter through oral discussions with MB customer representatives. Dkt. no. 67 at 30–33. Tenth Circuit law on typicality does not demand identical factual circumstances. *Milonas v. Williams*, 691 F.2d 931, 938 (10th Cir.1982) ("(E)very member of the class need not be in a situation identical to that of the named plaintiff. *Rich v. Martin Marietta Corp.*, 522 F.2d 333, 340 (10th Cir.1975)"), *cert. denied*, 460 U.S. 1069, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983); *Penn v. San Juan Hospital, Inc.*, 528 F.2d 1181, 1189 (10th Cir.1975) ("It is to be recognized that there may be varying fact situations among individual members of the class and this is all right so long as the claims of the plaintiffs and the other class members *are based on the same legal or remedial theory.*") (emphasis added). The court finds the *Penn* court's formulation of the typicality test of different facts but the same legal theory persuasive and dispositive here.

Plaintiffs allege they will prove after discovery that MB failed to disclose material facts that would affect all customers' deci-

sions to contract for IWMS during all phases of IWMS sales. In addition to the omissions concerning the initial negative sale related above, plaintiffs allege omissions or concealment of facts in MB's billing practices. As MB admits, even though plaintiffs paid for IWMS each month, MB explained only once each year in Colorado that the "unregulated" charge on the monthly bill was for IWMS. Dkt. no. 67 at 35. Plaintiffs document that in New Mexico no charge for IWMS appeared on monthly bills until July 1987 and then only under the shibboleth of "unregulated." Dkt. no. 73 at 28 n. 16.

Plaintiffs' claim of omissions in the oral representations to customers by MB representatives since 1983 may have some classwide validity. An MB memo in late 1987 reveals that in an unknown number of states its customer representatives did not tell customers IWMS was optional. The memo also details a change in customer relations: "Colorado is currently ending the sales by telling the customer that the maintenance plans are optional." Dkt. no. 73, Ex. I. A 1984 memo to MB customer representatives states cryptically that "(m)uch of the time the customer actually has a need *not* to know." Dkt. no. 31 at Ex. D, p. 1.

The court surmises that these practices, a failure to bill or bill with adequate specificity and a failure to represent that IWMS is optional in oral solicitations or to make that disclosure at a meaningless time, could support void or voidable contract claims under the relevant Restatement (Second) of Contracts provisions. While two basic fact patterns emerge, the legal theory to remedy each is the same. The typicality requirement explained in *Penn v. San Juan Hospital*, 528 F.2d 1181, 1189 (10th Cir. 1975), is satisfied.

The court does not quarrel with the propositions found in the decisions MB cites on this issue, Dkt. no. 67 at 32–33; however, the court does not find them applicable on the instant facts. The named plaintiffs in the two district court cases MB cites wanted to proceed on different *legal theories* than the rest of the class. *Bartelson v. Dean Witter and Co.*, 86 F.R.D. 657, 661 (E.D.Pa.1980) (sex discrimination versus race discrimination); *Amswiss Int'l Corp. v. Heublein, Inc.*, 69 F.R.D. 663, 667 (N.D. Ga.1975) (in federal securities fraud litigation, affirmative misrepresentation claim representative is required to prove different elements than non-disclosure claim class members). These two decisions are consistent with *Penn*.

MB's reliance on *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977) is equally unavailing. The *Rodriguez* Court held that in an employment discrimination suit over defendant's promotion policy and practice for a certain position, the representatives, who were not qualified for the relevant promotion, could not represent a class of drivers who *were qualified* for the position. The *Rodriguez* holding represented a reaffirmation of the often repeated rule that the representative must " 'possess the same interest and suffer the same injury' as the class members." *Id.* at 404, 97 S.Ct. at 1897 (citations omitted). The proposed class meets this definition: they all possess equivalent IWMS contractual interests and suffered the same injury—allegedly they entered into void or voidable IWMS contracts.

MB makes a related argument that the named plaintiffs are not typical because their claims are factually broader than the rest of the class. Dkt. no. 67 at 47–48. The representatives, MB accurately states, do not remember reading the 1982 opt out notices or remember discussing IWMS with MB sales representatives when three of the four named plaintiffs changed phone service at some time after 1982. *Id.* MB is mistaken that plaintiffs complaint does not encompass these claims. Several paragraphs in the first amended complaint allege complete omissions during all stages of IWMS contract sales, Dkt. no. 47 at ¶¶ 19, 27–29, as well as omissions of material fact. *Id.* at ¶¶ 18, 20–21, 23–26. Second, the factual differences in the allegedly deceptive practices asserted by the representatives and the rest of the class do not destroy typicality. Partial omissions are subsumed within complete omissions. The

432

contract claims of the negative option and affirmative, orally solicited customers are sufficiently typical to allow class certification. Fed.R.Civ.P. 23(a)(3). With typicality satisfied, the court finds further that the named representatives will adequately represent the class, Fed.R.Civ.P. 23(a)(4). *See Falcon,* 457 U.S. at 157 n. 13, 102 S.Ct. at 2370 n. 13; *Spivak v. Petro–Lewis Corp.,* 118 F.R.D. 504, 509–10 (D.Col.1987)

### 4. Customer Notice

■ MB's arguments on *commonality* and *predominance,* Fed.R.Civ.P. 23(a)(2), (b)(3), focus on the allegedly individual questions of contract intent and reliance that purportedly stem from the various types of notices it sent to customers in the seven states at various times. Dkt. no. 67 at 33–9, 49–54. The parties' contentions on this issue are capsulized in the following excerpt from a September 1987 MB internal memo concerning customer response to MB's August 1987 IWMS notice to Colorado customers:

The notification is a maintenance agreement in the form of what legal people call a negative option contract. That means that if the customer didn't before—and doesn't now—take action, the billing remains in effect and we continue the coverage. This notice has made customers aware that this charge has been part of their bill all this time—and they don't like it.

The product managers sent the mailing at the behest of our lawyers, who said it might be a good idea to avoid any future risk of antitrust implications by letting customers know of the deregulation and their choices. But they left it up to the product managers to make the final decision.

According to John Gonzales, the notice has caused a flurry of calls to the business offices (over 6,000 as of yesterday). The customers are incensed because they were not aware they have been paying for wire maintenance all this time. John says 40 percent of the callers are canceling their contracts. So, we have an impact on both business office call volumes *and* on the bottom line.

Another problem, as Tony Seese–Bieda explains it, is that inside wire was deregulated January 1, yet we are just now getting the notice out in Colorado. Very few people remember the bill insert we sent them the first of the year alerting them to this change and saying the agreement would be sent to them "next month." *And who knows how many even saw that first bill insert?* (Notice is also currently going out in Utah, New Mexico and Malheur. Utah and New Mexico are sending it out in small bunches—not all at once. Utah says about 20 percent of their calls to the business office are on this subject and 80 percent are canceling the service.)

When Wyoming sent notice last spring, they had a lot of complaints and cancellations, also. Montana much earlier included inside wire among a list of other products and services being deregulated and it got relatively little notice. Also earlier, Idaho went to great lengths to inform its customers of the change and allow customers to affirm their desire to sign up. There was positive reaction.

Dkt. no. 73 at Ex. J (first emphasis in original).

In addition to MB's acknowledgment in the above memo of the possible inadequacy of the negative option notice and MB's potential liability for its conduct, plaintiffs point to other documents identified after minimal discovery to blunt the multiple notice defense on a class-wide basis. First, they cite a finding from a 1984 MB marketing survey in Colorado: 71 percent of the MB customers interviewed stated they *did not* have an IWMS contract when 80 percent of MB Colorado customers *did have* IWMS contracts. *Id.* at Ex. H, pp. 0033711–12. Second, MB's customers in the seven states subscribed to IWMS at a 79 percent rate after the initial negative option sale, while in Oregon, a state where the public utility commission mandated an affirmative option sale of IWMS, 16.5 percent of the customers subscribed to IWMS. *Id.* at 28–29; Dkt. no. 31, Ex. C.

MB, on the other hand, accentuates the differences in the notices customers re-

ceived in the seven states: Colorado and New Mexico customers received five notices during the relevant time period while Utah customers received the fewest, one; notices went out at different times, although the court notes that most notices are in two categories—the negative option sale and the post-deregulation sale in late 1986 and 1987; state regulatory agencies approved some IWMS notices; and the court notes significant differences in the quality of notice given to customers in the various states. *Compare* the first notices in Arizona and Wyoming *with* those in New Mexico and Idaho. Dkt. no. 67 at Ex.'s 2, 32 & 23, 16.

MB argues that "it cannot be subjected to a trial in which a broad, erroneous generalization [about inadequate notice] is applied to every customer." *Id.* at 35. The different notices in each state preclude commonality on the issue of contractual intent in the proposed seven state class, MB asserts. Under Restatement (Second) of Contracts § 69(1)(b), the question of whether silence is acceptance is based on the offeree's intent. If the class members in the different states received notices with varied contents, the proposed seven state class could not have reached a common point on contractual intent, MB surmises. Furthermore, customers throughout the class contracted for IWMS at different times and therefore received different amounts of notices. For example, a customer with service from 1982 or before to the present in New Mexico would have received five notices while a customer that started service in Montana in 1986 would have received two notices. Thus, even *within* a state, MB concludes, no common questions of contractual intent can exist.

The result is a Sisyphian or never ending task for the court. MB proposes that the court would have to preside over legal proceedings estimated to last several hundred years: All plaintiffs would come before the court for a mini-trial on what notice they received, what their reaction to the notice was and whether they decided to contract for IWMS by remaining silent. Dkt. no. 67 at 51; Tr. of Oral Argt. at 41–42, 47–48.

While Methuselah could sit on the proceedings MB envisions, this court could not. The specter of lengthy proceedings is not dispositive, though. The court is not convinced every plaintiff will have to visit the courthouse. First, the scenario MB envisions would clearly contravene the requirement of Fed.R.Civ.P. 23(b)(3) that common questions of law or fact predominate over individual questions. The subsection (b)(3) predominance inquiry is essentially a "pragmatic" decision by the district judge to determine if "one or more of the central issues in the action are common to the class." 7A *Federal Practice* § 1778 at 528, 529. The requirement ensures that claims of class members will be so similar that prosecution by a few members of the class will be fair and dictates that a court balance the interests of the litigants. 7A *Federal Practice* § 1777 at 518–19. The Tenth Circuit interpretation of subsection (b)(3) focuses on the existence of a "common nucleus of operative facts." *Esplin v. Hirschi,* 402 F.2d 94, 99 (10th Cir.1968); *Joseph v. General Motors Corp.,* 109 F.R. D. 635, 641 (D.Col.1986).

The Tenth Circuit formulation of the (b)(3) predominance standard in *Esplin* of a common nucleus of facts is consistent with the explanation by the Advisory Committee to the 1966 revisions of Rule 23 on when a common law fraud class action is appropriate. The Committee instructed courts to determine if the defendant's fraudulent activity was common to the class:

(A) fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class. On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.

39 F.R.D. 69, 103 (1966).

The court believes the predominance test is satisfied. A common course of conduct

to omit material information that would make the IWMS contracts void or voidable is colorable at this juncture. The ability of plaintiffs to succeed on the merits is not at issue now. *Foltz v. U.S. News & World Report, Inc.*, 106 F.R.D. 338, 341 (D.D.C. 1984); *In re Indep. Gasoline Antitrust Litig.*, 79 F.R.D. 552, 561 (D.Md.1978). First, the evidence discussed above reveals that MB had some knowledge that customers were wholly unaware of the existence of IWMS contracts in 1984 and 1987 in Colorado. Discovery, stayed on the merits pending class certification, may prove that customers in the other states were as unaware of the existence or terms of IWMS contracts as Colorado customers.

Second, a common nucleus of facts on nondisclosure is colorable because MB may coordinate operations in the seven state region. MB's claim of wholly separate operations in each state is undercut by the language in several MB memorandums cited by plaintiffs. They indicate that MB's operations in each state were not wholly independent. MB also listed the identical percentage of IWMS customers in all seven states in 1984. Plaintiffs' claim of a region wide plan to omit material information is also buttressed by the experience of MB's sister company in Oregon. In that state, the public utility regulatory body mandated an affirmative option contract and customers in large part refused to contract for IWMS. If plaintiffs can show a coordinated, region-wide operation by MB to omit material facts, plaintiffs may satisfy the provisions of Restatement (Second) of Contracts §§ 159–164.

To satisfy the predominance inquiry and rebut MB's claim of individual issues on the contract claim, plaintiffs rely on a line of authority that creates a *rebuttable presumption* of reliance on material misrepresentations in a class action voidable contract situation. *Brickyard Homeowners' Assoc. Management Comm. v. Gibbons Realty Co.*, 668 P.2d 535, 543 (Utah 1983); *Vasquez v. Superior Court*, 94 Cal.Rptr. 796, 805, 484 P.2d 964, 973 (1971); 12 *Williston on Contracts* § 1515 at 480, § 1515C at 495 (W. Jaeger, ed. 1970). The court notes that an inference of reliance is logical

in an omission of material facts situation because of the difficulty in proving what the party would have done if it had had the relevant information. The court also recognizes the Supreme Court's broad approval of presumptions in cases like this one where "direct proof ... is rendered difficult" and "considerations of fairness, public policy, and probability, as well as judicial economy" make presumptions "useful." *Basic Inc. v. Levinson,* —— U.S. ——, 108 S.Ct. 978, 990, 99 L.Ed.2d 194 (1988).

The court, however, agrees with MB that the creation of a rebuttable presumption does not solve the predominance of common questions problem; it merely begs the predominance question. Tr. of Oral Argt. at 46–47. First, the courts in *Vasquez* and *Brickyard Homeowner'* assumed a common set of misrepresentations to the plaintiff class. 484 P.2d at 973; 668 P.2d at 543. Second, the defendant must be able to set up a class wide defense in rebuttal. As stated above, the court believes plaintiffs may be able to show class wide omissions of fact in all IWMS transactions after discovery. The presumption of reliance would then be helpful to plaintiffs but not dispositive of the formation of contract issue. The further development of the facts on the void/voidable contract question will determine whether this issue is ultimately submitted to a jury as a class action.

MB relies principally on two cases from other circuits, *Simer v. Rios*, 661 F.2d 655 (7th Cir.1981), *cert. denied*, 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982) and *In re Hotel Telephone Charges*, 500 F.2d 86 (9th Cir.1974), to support its contention that issues of intent and reliance are individual questions and per se preclude class certification. Dkt. no. 67 at 36–38, 50–54. The court finds neither case persuasive. The *Simer* decision is inapplicable for two reasons. First, MB's extensive quotations from *Simer* are all taken from a dicta section of the opinion. The district court and the Seventh Circuit determined class certification was improper because it was impossible to identify the plaintiff class. *Simer*, 661 F.2d at 669–71. The *Simer*

court's entire discussion of how and why individual questions preclude predominance of common questions, *Id.* at 671–77, was entirely unnecessary for resolution of the appeal. MB cites only to the predominance section. Furthermore, the Seventh Circuit discussed the (b)(3) requirements without the benefit of the parties raising the issue below, the district court passing on the question or the parties briefing or arguing the point on appeal. *Id.* at 671 n. 28. This court finds legal discourse created in a vacuum—without the benefit of arguments, briefs or a decision below—of little value.

Second, the dicta portions of *Simer* MB relies on are also not analogous to the instant facts. The proposed class in *Simer* consisted of all indigent persons who failed to apply for a subsidized utilities program because of an invalid, overly restrictive federal regulation. The court found that the two critical issues remaining in the case were not amenable to class treatment because they concerned the state of mind of each plaintiff. The first issue was a re-hash of the identity problem decided earlier in the opinion. The Seventh Circuit found it impossible to divine *who* might have applied for energy assistance grants if the regulation was properly drawn. *Simer,* 661 F.2d at 669–71 & 673. The identity of the proposed class is not at issue in the instant litigation. The second state of mind issue identified by the *Simer* court was damages: What damages did the plaintiff suffer because of his or her perceived inability to apply for utility assistance. *Id.* at 673, 675. Damages are also easily calculated in this case. *Simer* is not controlling.

The Ninth Circuit in *In re Hotel Telephone Charges,* 500 F.2d 86 (1974), reversed class action certification on a class with two claims—antitrust conspiracy and fraud. *Hotel Charges,* as another court recognized, "involved 'virtually every manageability question possible.'" *Six Mexican Workers v. Arizona Citrus Growers,* 641 F.Supp. 259, 267 (D.Ariz. 1986). The plaintiff class consisted of nearly forty million persons with an average recovery of two dollars per person. The defendants included forty-seven hotel chains and approximately six hundred individual hotels. *Hotel Charges,* 500 F.2d at 88. The debilitating manageability concerns found in *Hotel Charges* are not present here. The defendant class is one corporation instead of many, and the plaintiff class is smaller, easier to identify and each class member has a much larger claim. Second, the lack of common misrepresentations by the hundreds of entities in *Hotel Charges* is not apparent here. MB made all the representations and the plaintiffs may show after completion of discovery that all representations lacked material facts about IWMS.

While the court is not totally free of doubt on the predominance of common questions in the pendent claim, the court agrees with the Tenth Circuit that "if there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require." *Esplin v. Hirschi,* 402 F.2d 94, 99 (10th Cir.1968); *accord In re School Asbestos Litig.,* 789 F.2d 996, 1011 (3rd Cir.1986), *cert. denied,* 479 U.S. 852, 915, 107 S.Ct. 182, 318, 93 L.Ed.2d 117, 291 (1986); *Spivak v. Petro-Lewis Corp.,* 118 F.R.D. 504, 506 (D.Col. 1987); *see Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation.")

The court views the Tenth Circuit's instruction in *Esplin* persuasive here for several reasons. First, the facts of this case are not yet fully developed. Discovery on the merits has been stayed. A grand scheme by MB to omit material facts may or may not develop from the admissible evidence. The applicability of class wide proof may go from colorable to plausible or to untenable. In stark contrast, the Tenth Circuit refused to apply the *Esplin* 'err in favor of certification' reasoning when the facts of the litigation would not change by discovery or subsequent proceedings. *Wilcox v. Commerce Bank of Kansas City,*

474 F.2d 336, 344 (10th Cir.1973). Second, the court may reduce the number of states in the class after ruling on the state action defense. A change in the states included in the class could significantly alter the ease or difficulty of class wide proof. Third, the court continues to have the power to decertify the class, Fed.R.Civ.P. 23(c)(1), or to entertain a subsequent motion for summary judgment or to dismiss. The class certification decision is not carved in stone tablets.

The court finds that the predominance of common questions test of Fed.R.Civ.P. 23(b)(3) is met.

### 5. Superiority

■ Finally, the court considers the second test of Fed.R.Civ.P. 23(b)(3): Is a class action suit a superior method to adjudicate the controversy? The court concludes that a class action is a fair and efficient method for resolving plaintiffs' claims. Plaintiffs have small claims that they could not effectively litigate on an individual basis. Without the class action procedure, plaintiffs would have no remedy for the allegedly void or voidable contracts. 7B *Federal Practice* § 1781 at 25. The efficacy of resolving all plaintiffs' claims in a single proceeding is beyond discussion. MB's arguments on the lack of common questions and conflicting state law, Dkt. no. 67 at 56–57, are discussed elsewhere in this opinion. The pendent claim satisfies Fed.R.Civ.P. 23(b)(3).

### III. NOTICE

■ The parties dispute both *who* should receive individual notice within the class and *how* plaintiffs should send individual notice to the class. The dispute about who should receive individual notice concerns past customers of MB. MB's records are based on telephone numbers, though, not customers' names. MB keeps computerized records of all telephone numbers for approximately six months. For customers who changed telephone numbers or telephone service at a telephone number more than six months earlier, information about the customer and the number is available on microfiche. The information

on microfiche is accessed by putting each fiche in a machine for viewing and then manually recording information from the viewing screen. Dkt. no. 33 at 36–39. Plaintiffs propose to provide notice to all inactive customers, those whose telephone numbers are on microfiche, by publication. MB contends plaintiffs must retrieve each inactive customers' name from the microfiche records and give them individual notice.

The Rule provides that in any (b)(3) class action, "the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed.R. Civ.P. 23(c)(2). In the seminal case interpreting Rule 23(c)(2), the Court held that to comport with due process "(i)ndividual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 173, 94 S.Ct. 2140, 2150, 40 L.Ed.2d 732 (1974). The hallmark of the notice inquiry in cases before and after *Eisen* is reasonableness. *See Tulsa Professional Collection Services, Inc. v. Pope,* —— U.S. ——, 108 S.Ct. 1340, 1344, 99 L.Ed.2d 565 (1988); *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

The court accepts plaintiffs argument that it is unreasonable for plaintiffs to retrieve the names of all inactive customers for the past five years from MB's microfiche telephone number records. The task MB proposes is unreasonable because it is futile; it would not provide notice to more customers. First, if a customer moved within MB's seven state region during 1982–87 and is currently a phone customer, he or she will receive notice as a current customer. Second, if a customer discontinued service with MB and moved out of the region, MB's records would not provide plaintiffs with a current address. If plaintiffs sent notice to a non-current address, the inactive customer would not receive notice.

Third, the number of past customers who discontinued service and did not move out of MB's region or resume service with MB in another part of the seven state area is quite small. In 1987, nearly ninety-three percent of Americans had phone service. *Farmer's Almanac* (1988). Of those who do not now have phone service, the number that had phone service, discontinued it and stayed at the same address is undoubtedly small. Moreover, the cost of retrieving the names of all past customers and sending out first-class individual notice to them is patently unreasonable in light of the limited benefit this gargantuan task would provide. The court finds that publication notice to inactive customers complies with Fed.R.Civ.P. 23(c)(2).

 The second notice question is how plaintiffs should provide individual notice to the class members who are current MB customers. Plaintiffs propose to send notices out via MB's monthly billing statements. The Court in *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 355 n. 22, 98 S.Ct. 2380, 2391 n. 22, 57 L.Ed.2d 253 (1978), generally approved of the arrangement plaintiffs propose. This arrangement is permissible if the defendant can perform some or all of the tasks related to providing notice with greater ease than plaintiffs. *Id.* at 356–57, 98 S.Ct. at 2392.

The *Oppenheimer Fund* test is easily met in this case. The alternative to MB stuffing inserts in its monthly bills, a service MB sells to businesses for 2.1 cents per insert, is unreasonably difficult and expensive. Plaintiffs would have to create a computer program to retrieve all the current customers and their addresses, purchase envelopes and postage, transfer the current customers' addresses to the envelopes, and stuff an insert into the envelopes. This alternative process would cost more than ten times as much, in postage alone, than including an insert in MB's monthly billing. The limited increase in awareness of the suit this method could provide to the class does not warrant the drastic increase in cost. Plaintiffs may provide individual notice to the current class members by placing an insert into MB's monthly bills.

The court will review the content of the individual notice and the publication notice and review the amount MB will charge plaintiffs for sending out notices at a later date.

## IV. MOTION TO DISMISS PENDENT CLAIM

After the hearing on class certification, MB filed a motion to dismiss plaintiffs' pendent state claims. Dkt. nos. 85 & 86. The court issued an order on July 14 which stayed resolution of the class certification question until full briefing on the motion to dismiss. Dkt. no. 88. The parties have now fully briefed the additional question, and the court is prepared to rule.

 The parties agree that the court has jurisdiction to hear the pendent claim but differ over whether the court should exercise its discretion to hear it. The inquiry is governed by the Supreme Court's now well known enumeration of the relevant factors in *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Like a decision on class certification, a determination to assume pendent jurisdiction is not irrevocable. "(T)he issue whether pendent jurisdiction has been properly assumed is one which remains open throughout the litigation. Pretrial procedures or even the trial itself may reveal a substantial hegemony of state law claims, or likelihood of jury confusion, which could not have been anticipated at the pleadings stage." *Id.* at 727, 86 S.Ct. at 1139.

 The court first finds that "considerations of judicial economy, convenience and fairness to litigants" do exist and support a decision to retain the pendent claim. *Id.* at 726, 86 S.Ct. at 1139. Plaintiffs seek to go to trial in one forum on a suit that concerns MB's conduct in seven states. Obviously, the procedure plaintiffs envision is the most economical. The cost of discovery in time and money for depositions, interrogatories and the production of documents will be the least with one plaintiff class that encompasses all seven states in-

stead of seven plaintiff class actions in seven states. Under plaintiffs' proposal, the federal court in one state is burdened with a protracted suit. If the pendent claim is dismissed, plaintiffs in seven states would have to file state court actions. Although this suit is complex, the court finds that the judicial systems in the seven state region would on the whole have considerably less work if the pendent claim is retained with the federal action.

The court also finds plausible at this point plaintiffs contention that the evidence it will introduce to support the pendent contract claim and the antitrust claim will be largely coextensive. The omissions of material fact which the voidable contract claim rests on will also demonstrate MB's exclusionary or restrictive conduct under the monopolization count, plaintiffs assert. The lack of significant *additional* trial time to prove the pendent claim is important. While the benefits to the court of economy and convenience are substantial, the court must also consider other factors. *Id.* at 726–27, 86 S.Ct. at 1139.

MB argues that the pendent claims would cause immense jury confusion. Dkt. no. 86 at 4–10 & Dkt. no. 95 at 3–4. The court does not find this contention as troublesome as MB does. First, some of the possible confusion MB notes is eliminated by plaintiffs not pressing the fraud claim. As noted above, see p. 421, plaintiffs focused on the void or voidable contract count at oral argument and in their Response to the Motion to Dismiss, Dkt. no. 95. Second, also as described above, see pp. 427–429, the law on the voidable contract claim is similar enough in the foreign states and the forum state to pass constitutional choice of law analysis. The similarity in the substantive contract law eliminates much of the complex decision making matrix MB uses to argue against the assertion of pendent jurisdiction. Third, if the factual circumstances are as divergent as MB claims, the case will not proceed to the jury as a class action. With these points mooted or muted, MB's jury confusion contention lacks force.

The parties also spend much of their time on damages issues. Dkt. no. 87 at 4–7; Dkt. no. 95 at 4–9. First, they dispute whether a contract measure of damages like restitution is permissible under antitrust law and if the restitution-antitrust damages remedy is available without the pendent claim in the case. As MB notes, these issues are not germane at this time. Dkt. no. 95 at 6. Second, MB is concerned that one or two states *allow* punitive damages on a contract action. Dkt. no. 95 at 5 n. 1. MB argues that the potential use of this remedy improperly expands and complicates the damages section of the action. The specter of this problem in a minority of states does not carry particular weight at this juncture with the court. The court notes that plaintiffs may lack after discovery sufficient facts to support a punitive damages claim in those states. Also, MB's state action defense may remove the federal claim covering those states to which the contract claim is appended and totally eliminate those states from the plaintiff class. The court can deal with the punitive damages problem, if it arises, at a later date.

The court does not believe this is the "exceptional" case where it should decline to exercise its jurisdictional power over the pendent claims. *Phillips v. Smalley Maintenance Services, Inc.,* 711 F.2d 1524, 1531 (11th Cir.1983); 13B *Federal Practice* § 3567.1 at 144 (1984). The extensive amount of resources of both the judiciary and the parties saved by continuing the case in its current posture, rather than causing plaintiffs to file seven class actions, is an extremely important consideration. The court does not discount lightly MB's concern about the lack of case law on point in several states. Dkt. no. 95 at 12–13. The court is not surprised that this situation has not arisen previously because of the recent break up of AT & T. The Restatement (Second) of Contracts provisions plaintiffs and defendant rely on are not radical shifts in the law. They are both direct descendents of the original Restatement. If some of the arguments MB asserts ultimately materialize, the court always retains the power to alter this deci-

sion. *Gibbs*, 383 U.S. at 727, 86 S.Ct. at 1139. The motion to dismiss is denied.

IT IS BY THE COURT THEREFORE ORDERED that the Motion to Certify the Plaintiff Class is granted on the monopolization and voidable contracts counts. IT IS FURTHER ORDERED that the Motion to Dismiss Pendent Claims is denied.