**Linda DAVIS, Plaintiffs,**

v.

**SOUTHERN BELL TELEPHONE & TELEGRAPH COMPANY, Defendant.**

**No. 89–2839–CIV.**

United States District Court, S.D. Florida.

June 8, 1994.

---

1. Defendant Solna Web joined in Evello Investment's motion. *See* (Doc. # 17).

See also 149 F.R.D. 666.

William Hamilton, Holland & Knight, Philip Carver, Southern Bell Telephone and Telegraph, Miami, FL, for Southern Bell Tel. & Tel.

Guy B. Bailey, Bailey & Hunt, Miami, FL, for plaintiffs.

Parker Thomson, Jr., Thomson, Muraro, Razook & Hart, P.A., Miami, FL.

Frank Love, Powell, Goldstein, Frazer & Murphy, Atlanta, GA.

## *ORDER*

NESBITT, District Judge.

This cause comes before the Court upon Defendant Southern Bell Telephone & Telegraph Company's ("Southern Bell") Motion For Partial Reconsideration Of Order Certifying Class As To Certain Substantive Issues and upon Southern Bell's Motion To Reconsider Order Denying Southern Bell's Motion For Summary Judgment On Plaintiff's Monopolization Claim. In its motion for partial reconsideration of order certifying class, Southern Bell requests decertification of Plaintiffs' state law claims. The Court previously addressed the motion in its Order of February 1, 1994. In that Order, the Court severed the liability issues connected with Plaintiffs' claims in Counts V–XII of the First Amended Complaint from issues related to individual reliance and damages with respect to those counts. The Court deferred final ruling on the suitability of the liability issues for class certification pending an evi-

dentiary hearing on the matter. The only question remaining concerns the appropriateness of certification under Rule 23(b)(3); in particular, whether liability questions common to the class predominate over liability questions affecting only individual class members. On April 15, 1994, the Court conducted a hearing at which both parties presented evidence concerning this issue. At the conclusion of the hearing, the Court authorized the parties to file supplemental memoranda addressing the issue. The memoranda have now been filed and the issue is now ripe for disposition.

 In this case, the liability issues connected with Counts V–XI all turn on whether the statements/omissions that Southern Bell made to purchasers of Inside Wire Maintenance Service ("IWMS") were material and fraudulent [1]. In any potential class action based on fraudulent misrepresentations, there is a significant risk that individual issues will overwhelm those common to the class. Where the class is large and where the defendant made materially different misrepresentations to each class member, for example, there may be so many misrepresentations at issue that trial on a class basis of questions connected with the fraudulence or materiality of those misrepresentations might be impractical. Trial on that basis may be appropriate, however, where the plaintiffs can identify a small core of misrepresentations that the defendant made to all, or most, of the class members.

In order to prove the existence of such a core, the plaintiffs must identify the misrepresentations in the core and must then prove that the defendant's *presentations* of the misrepresentations did not vary materially from one another. If the plaintiffs cannot make this proof, then each core misrepresentation really consists of a multitude of different misrepresentations. More important, the fraudulence or materiality of these misrepresentations is relevant only to the claims of the class members to whom made, not to the class as a whole. If, on the other hand, the plaintiffs can prove that the defendant's presentations of each core misrepresentation did not vary materially and that each misrepresentation was presented to all, or a substantial number, of the class members, then the question of the fraudulence or materiality of those misrepresentations is common to the class as a whole.

It is important to emphasize that the focus of this inquiry must be the degree of similarity between *different presentations* of the *same alleged misrepresentation*. Thus, with regard to any particular misrepresentation in this case, the relevant question is not whether that misrepresentation is materially different from other representations that Southern Bell made about IWMS to customers, but whether Southern Bell's *presentations* of the misrepresentation are materially different *from one another*. This, in turn, consists of two subquestions; whether the oral presentations of the misrepresentations varied materially from one another and whether any of the oral presentations varied materially from the presentations in the written solicitations sent to customers.

In order to address these questions, it is necessary to consider the nature of the misrepresentations at issue and the ways in which the presentations of those misrepresentations might have varied materially. Plaintiffs have identified a core consisting of two categories of misrepresentations: 1) pure omissions [2]; and 2) representations con-

---

1. In Count XII, Plaintiffs allege that Southern Bell breached its contractual duty of good faith and fair dealing by, among other things, impeding customer efforts to cancel their subscriptions to IWMS. In its Order of February 1, 1994, the Court entertained doubts concerning whether Southern Bell did this in a uniform manner with respect to all class members who attempted to cancel their subscriptions, but explained that it would afford Plaintiffs an opportunity to prove the contrary at the evidentiary hearing. At the April 15, 1994 hearing, however, Plaintiffs put on no evidence concerning this issue. Plaintiffs have therefore failed to carry their burden with respect to the claims in Count XII and the class must be decertified as to those claims.

2. Examples in this category include Southern Bell's failure to inform customers that: 1) a substantial "trouble location" charge would be imposed in the event that the problem reported by a customer was in the customer's telephone set; 2) customers would be billed for additional inside wire maintenance charge for each access line in their homes or businesses; and 3) a

joined with related omissions [3]. Because of the nature of an omission, the presentations of the pure omissions could not have varied materially. Either the omissions were made or not. If they were made, they must all have been made the same way. Thus, the only question concerning the appropriateness of certification of the omissions is whether the omissions were made to all, or many, of the class members.

The mixed representations/omissions stand on a somewhat different footing. Southern Bell might have varied the presentation of these misrepresentations in at least two ways. First, Southern Bell might have varied the substance of the representations. Second, Southern Bell might not always have conjoined a representation with the appropriately related omission. In other words, in some instances, Southern Bell might have made the representation, but then have supplied the additional information made relevant by the representation. In order to prove that the mixed representations/omissions are suitable for class action treatment, Plaintiffs must demonstrate both that Southern Bell did not vary the representations/omissions in these ways and that South-

ern Bell made the representations/omissions to all, or many, of the class members.

### I. Absence Of Material Variations Among Presentations Of Mixed Representations/Omissions

#### 1) Oral Presentations

Plaintiffs presented sufficient evidence at the April 15, 1994 hearing to demonstrate the absence of material variations among the oral presentations of the mixed representations/omissions. In particular, Plaintiffs produced substantial evidence to support their contention that Southern Bell's sales representatives relied upon written scripts when making oral sales presentations concerning IWMS. These scripts consisted of passages from a handout, and at least two editions of the handbook, used to train the sales representatives. The scripts contain all of the representations at issue in this case and contain none of the information covered by the omissions related to those representations [4]. Further, although the scripts are worded slightly differently, the substance of the information contained in the scripts is identical across all of the scripts [5].

customer's IWMS subscription could be discontinued at any time.

3. Examples in this category include: 1) Southern Bell's juxtaposition of information concerning the high cost associated with inside wire "spot repairs" with the low monthly cost of the IWMS plan, without any accompanying reference to the historically low failure rate for inside wires; and 2) the use of terminology suggesting that IWMS covers the customer's telephone cord, unaccompanied by any explanation that the service covers only wires inside the walls of customer's residence.

4. The scripts, for example, provide information concerning the high cost of "spot repairs" without providing any information concerning the historical rate of inside wire failure. They also use terminology like "your inside wire" without explaining that the term covers only wiring within the walls of the customer's residence.

5. The script in use as of October 1987, for example, provides that:
Mrs. Customer, you have a choice of who provides maintenance of your inside wire. You may do it yourself or we can do it for you by offering you a service plan for $2.00 per month (per line). This includes repair to stan-

dard wiring and jacks. It also provides for determination and isolation of a trouble condition on inside wire, jacks and/or telephone sets. It does not include repairs to your telephone sets. However, should we come out and find trouble in your set, there would not be a charge for the trip to your premises. Shall I order the service plan for you?
Mrs. Customer, without this plan if you report your service out of order and we dispatch a technician to your premises and the trouble is not located on our side of the network interface, which is the point where our line comes into your premises, there is a charge for the trip. Currently if we isolate the trouble to your sets or inside wiring/jacks or repair your inside wire/jacks and you do not have the plan, the charge is $46.50 for the 1st 15 minutes or fraction thereof, and $13.50 for each additional 15 minutes or fraction thereof. As you can see the service represents quite a potential savings.
The analogous passage from the script that went into use in January 1990 provides that:
I'd like to tell you about our optional Southern Bell service plan for $2.50 per month, per line. The Service Plan does not include actual repair to telephone sets. However, it does include repair to standard wiring and jacks that meet technical standards. Shall I order that for you?

The great bulk of the evidence presented at the April 15, 1994 hearing indicates that, although Southern Bell's sales representatives did not always recite the language of the scripts verbatim in the course of their sales presentations, they did not vary the substance of any of the representations in the scripts. The same evidence demonstrates that the sales representatives virtually never provided the additional information made relevant by these representations, i.e., that Southern Bell always conjoined the representations at issue with the related omissions. Four former sales representatives, for instance, testified that they either read the texts of the scripts verbatim, recited the scripts from memory, or communicated in their own words the substance of the information contained in the scripts. *See* Transcript of April 15, 1994 hearing ("April 15, 1994 Tr.") at 44, 102, 124, 166. In addition, Deborah Booth, a former Southern Bell sales representative and Communications of America representative [6], testified that she acted on behalf of several sales representatives against whom Southern Bell initiated disciplinary proceedings for deviating from the scripts. *Id.* at 144, 145, 150, 151. She also testified that, in the course of these proceedings, several of Southern Bell's managers told her that it was the company's policy to require the sales representatives to follow the scripts. *Id.* at 150, 151. A memorandum from the company's Operations Staff Manager to all Operations Managers confirms this. The memorandum states in pertinent part:

> Our recommendation would be to say the disclosure statements word for word. However, as long as each point is covered, the service representatives can say the disclosure statements in their own words.

Plaintiffs' Exhibit 6 at 2. Even Lee Tittle, who served as a training manager of the sales representatives throughout most of the

period covered by this lawsuit, stated in deposition that:

> A customer is a customer. As far as the treatment of a new customer, treatment of an existing customer, they would receive the same type of disclosure information, and there would always have been disclosures from the inception of this plan.

Plaintiffs' Exhibit 21 at 25.

To counteract this evidence, Southern Bell relies on evidence concerning two sales methods utilized by the company's sales representatives—"needs based selling" and "overcoming objections". The "needs based selling" method requires the sales representative to propose to customers those optional telephone services that the representative believes fit the individual customer's needs, while the "overcoming objections" method requires the representative persist in attempting to sell an optional service after meeting initial resistance from the customer. According to Southern Bell, both approaches require the sales representative to develop a different sales pitch for each customer. Because of this, Southern Bell concludes that the representatives delivered materially different representations concerning IWMS.

As noted above, however, the issue before the Court is not whether Southern Bell made different representations to individual class members, but whether it made a core of misrepresentations to all, or most, class members and whether it made those misrepresentations in essentially the same way on each presentation. To the extent that the answer to the latter two questions is affirmative, the Court can retain class certification to determine fraudulence or materiality of the core misrepresentations.

■ The Court is aware of no evidence in the record indicating that the presentations of the representations forming part of the mixed representations/omissions ever

---

Mrs. Customer, without this plan, if you report your service out of order, we dispatch a technician to your premises and if the trouble is located on your side of the network interface, there is a $25.00 charge just for the trip. If we further isolate the trouble to your sets, inside wiring or jacks or repair your inside

wiring or jacks, the charge would then be $46.50 for the 1st 15 minutes or fraction thereof, and $13.50 for each additional 15 minutes or fraction thereof.

6. Communications of America is a union that represents workers in the communications industry.

varied materially [7]. True, many of Southern Bell's sales representatives apparently communicated these representations in their own words. Some even utilized analogies of their own to communicate these representations. The fact that they did so, however, does not change the fact that they expressed the same substantive information each time. These differences in expression are thus not material [8].

Moreover, all of the evidence in the record suggests that, where the sales representative made these representations, they then failed to supply the additional information made relevant by the representations. In other words, the record evidence demonstrates that the sales representative always made the representations and the related omissions together [9]. The Court concludes that there is no credible evidence that Southern Bell's oral presentations of its mixed representations/omissions varied materially [10].

2) Oral And Written Presentations

There is also no evidence that the presentations of the oral misrepresentations differed materially from the presentations of those misrepresentations in the written solicitations sent to customers in 1987, 1988, and 1989, respectively. To the contrary, the language of the written solicitations parallels the language of the scripts upon which Southern Bell's sales representatives relied to make the oral presentations. Although there are some differences in the precise language used to communicate the representations at issue, none of these differences is material [11]. The same is true of the language

7. The fact that sales representatives may have made representations besides those in the scripts and that these non-script representations were not uniform with respect to all class members does not preclude the certification of the class to try the fraudulence and materiality of certain of the representations in the scripts.

There are several reasons for this. First, proof of fraud and materiality both focus on the fraudulence or materiality of *individual* misrepresentations. Proof of fraud, for example, requires proof that: 1) a false *statement* of material fact; 2) known by the defendant to be false at the time it was made; and 3) made for the purpose of inducing the plaintiff to act in reliance thereon. *Vance v. Indian Hammock Hunt & Riding Club Ltd.*, 403 So.2d 1367 (Fla. 4th DCA1981).

Second, although fraud requires proof of intent and a defendant's statements made at the same time as the allegedly fraudulent statement normally bear on the defendant's intent in making the allegedly fraudulent statement, the sales representatives' non-script representations are not relevant to Southern Bell's intent with regard to the representations derived from the script. The record evidence discussed above shows that Southern Bell intended its sales representatives to act as mere conduits for the delivery of the information in the scripts and to communicate no more substantive information than that contained in the scripts. As a result, the only evidence relevant to Southern Bell's intent regarding the representations in the scripts consists of the scripts themselves and evidence bearing on Southern Bell's intent in *preparing* the scripts. Non-script representations made by sales representatives, against company policy, do not fall into either of these categories. As a consequence, the fact that such representations varied materially across sales presentations does not bar class certification.

8. Explaining, for example, that IWMS is good buy because, like AAA's towing insurance, it allows a customer to avoid a potentially substantial one-time cost by making small, but regular, payments is not materially different from contrasting the high cost of "spot repairs" for inside wire with the low monthly cost of the IWMS plan. They are really nothing more than two different ways of saying the same thing.

9. There is no evidence, for example, that the sales representatives ever contrasted the high cost of "spot repairs" for inside wires with the low monthly cost of IWMS, but then went on to explain that the data on inside wire failure indicates that the wires rarely fail.

10. This conclusion renders irrelevant Southern Bell's evidence concerning the number of sales representatives in Florida and the extent of "telephone churn" within the state. The company introduced this evidence to emphasize the vastness of the number of contacts between the company and the class members. The evidence could only be relevant to this proceeding, however, if conjoined with credible evidence indicating that, with each contact, the company materially varied its presentation of the core misrepresentations at issue. As noted, the Court has found no such evidence.

11. The script in use in 1987 provides in one passage that:
Currently if we isolate the trouble to your sets or inside wiring/jacks or repair your inside wire/jacks and you do not have the plan, the charge is $46.50 for the 1st 15 minutes or fraction thereof, and $13.50 for each additional 15 minutes or fraction thereof. As you can see the service represents quite a potential savings.

used in the various written solicitations[12].

## II. Number Of Class Members Affected

As noted above, class certification of the question whether the core misrepresentations identified by Plaintiffs is only appropriate to the extent that those misrepresentations were made to all, or a substantial number, of the class members. There is no question that they were. The parties appear to agree that all class members subscribed to IWMS pursuant to either an oral sales presentation or a written solicitation. Based on the foregoing, it is clear that the oral presentations were all based on the written scripts discussed above. As noted, those scripts contain all of the core misrepresentations. Thus, any class member who subscribed to IWMS pursuant to an oral sales presentation either during or after October 1987, the date of the first script in evidence, would have been exposed to all of the core misrepresentations[13]. Depending on the dates of their subscriptions, they may also have received some or all of the 1987, 1988, or 1989 written solicitations. Those who subscribed pursuant to either written solicitations or oral presentations and maintained their subscriptions throughout the period of the lawsuit were exposed to the 1987, 1988, and 1989 written solicitations. Those who maintained their subscriptions for some, but not all, of that period were likely to have been exposed to the 1987 written solicitation at a minimum. In fact, Southern Bell's evidence regarding "telephone churn" suggests that many class members had multiple contacts with Southern Bell concerning IWMS after 1986. With each of these contacts Southern Bell commu-

The written solicitation sent to customers in 1989 provides in a similar passage that:

Without this service, Southern Bell's minimum charge to repair your inside wiring would be no less than $87.00 for the first full hour. These plans represent a savings in the event of a problem with the telephone wiring inside your premises.

12. The 1988 solicitation, for example, provides that:

As you know, you are currently paying 55 cents per month for Southern Bell to maintain the telephone wire inside your home or office. Effective March 1 the rate for this inside wire plan will increase to $1.00 per month. The terms and conditions are stated on the next page.

Payment of your bill in full demonstrates your desire to continue this valuable service at the new rate of $1.00 and your acceptance of the terms and conditions shown on the following page. If you do not wish to continue participation in the inside wire plan simply deduct $1.00 from your bill and you will be dropped from the plan. If you choose to cancel Southern Bell maintenance of your inside wiring, any repairs needed thereafter may be made by you.... or by someone of your choice.... or by Southern Bell, at your request, on a time and materials basis (our minimum charge without the maintenance plan would be $46.50).

If you have any questions, please call toll free 1–800–331–2355.

Terms And Conditions

Southern Bell will maintain or repair all simple telephone wiring inside your residence or business, excluding damage caused by fire, acts of GOD, riots, gross negligence, willful damage, vandalism, or wire not meeting Southern Bell's technical standards or installation guidelines. Southern Bell shall not be liable for damage, including incidental or consequential, arising from a customer's inability to use such inside wiring.

The 1989 solicitation provides that:

As you know, you currently subscribe to either Southern Bell's Inside Wire Maintenance Plan or its Combined Plan for Inside Maintenance and trouble Isolation Protection. Under these plans, Southern Bell maintains the telephone wire inside your home or office. Effective with bills dated on or after June 15, 1989, the rate for Inside Wire Maintenance Service, under either of these plans will increase by 50 percent per month. Without this service, Southern Bell's minimum charge to repair your inside wiring would be no less than $87.00 for the first full hour. These plans can represent a savings in the event of a problem with the telephone wiring inside your premises. Thank you for continuing to subscribe to this valuable service.

13. At least one of the sales representatives testified that she only recited the second paragraph of the applicable script—which informs the customer about the high cost of "spot repairs"—in the event that the customer had questions about the plan, or objections to it, after recitation of the first paragraph. The scripts themselves indicate that this is the procedure to be followed. Several of the sales representatives testified that they were frequently required to "overcome objections", however. Given that they relied on the second paragraph of the scripts to do so, the information in that paragraph must have been communicated to many, though not all, of the class members who subscribed to IWMS pursuant to post-September 1987 oral sales presentations.

nicated to them most, if not all, of the core misrepresentations.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that:

1) Southern Bell's motion for partial reconsideration of order certifying class is DENIED with respect to Counts V–XI of the First Amended Complaint and GRANTED with respect to Count XII of the First Amended Complaint.

2) Southern Bell's motion to reconsider order denying Southern Bell's motion for summary judgment on Plaintiff's monopolization claim is DENIED.

3) The Court will issue a separate order setting the date for a conference concerning the content of the notice of this action to be sent to class members.

DONE AND ORDERED.