**Rick MEYERS, Sr., Plaintiff,**

v.

**SOUTHWESTERN BELL TELEPHONE COMPANY, Defendant.**

**No. CIV–95–827–C.**

United States District Court,
W.D. Oklahoma.

Jan. 9, 1997.

**500**

Mark A. Wolfe, Clemens Pate Leebron & Wolfe, Ben T. Lampkin, Lampkin Wolfe & Associates, Oklahoma City, OK, for Rick Meyers, Sr., on behalf of himself and all others similarly situated, plaintiffs.

Richard C. Ford, LeAnne T. Burnett, Andrew M. Coats, Crowe & Dunlevy, Oklahoma City, OK, for Southwestern Bell Telephone Company, a corporation, defendants.

### MEMORANDUM OPINION AND ORDER

CAUTHRON, District Judge.

On July 26, 1996, this Court ordered supplemental briefing regarding plaintiff's motion for class certification. The parties have submitted the information requested by the Court and this matter is again at issue. For the reasons stated below, plaintiff's motion for class certification is denied.

### I. Background

In 1983, the Federal Communication Commission began the process of deregulating many of the local telephone services provided by regional or local providers. As a part of this deregulation, the FCC delegated to the states the decision of whether inside wire maintenance service ("IWMS") should be unbundled from basic telephone service. The state of Oklahoma chose to maintain the status quo existing at that time, and therefore IWMS remained the responsibility of Southwestern Bell Telephone Company ("SWBT") until 1987. In 1986, the FCC furthered the deregulation of IWMS by requiring that the service be unbundled. In accordance with that ruling, the Oklahoma Corporation Commission mandated that IWMS be unbundled from basic service and that customers, not local providers, would be responsible for internal wiring.

Plaintiff, Rick Meyers, Sr., has filed suit asserting claims, both individually and on behalf of a class of individuals similarly situated in the state of Oklahoma, for violations of the Sherman Act, fraudulent misrepresentation and/or omission, negligent misrepresentation and/or omission, breach of contract and breach of the implied covenant of good faith and fair dealing. Plaintiff's complaint alleges SWBT engaged in deceptive and misleading techniques to induce customers into purchasing IWMS and has repeatedly raised the price for IWMS, evidencing SWBT's monopolization and attempts to monopolize.

Plaintiff seeks certification of the following class:

All persons residing in the State of Oklahoma who purchased inside wire maintenance services from SWBT for their residential telephone(s) from January 1, 1983 to the date of class certification.

Excluded from the class are defendant, any parent, subsidiary, affiliate, or controlled person of defendant, as well as the

officers, directors, agents, servants or employees of defendant, and the immediate family members of any such person.

(Compl. at 6).

In this Court's Memorandum Opinion and Order of July 26, 1996, the Court directed the parties to submit additional briefing on whether defendant had in fact employed a negative option contract or had engaged in uniform means of soliciting customers to purchase the IWMS service. The Court considered these facts central to an analysis of whether plaintiff has established the typicality requirement of Fed.R.Civ.P. 23(a)(3) and the requirement of Fed.R.Civ.P. 23(b)(3) that common issues predominate over individual issues.

In that Order, the Court also determined that the issues of commonality under Rule 23(a)(2) were not contested by the defendant, and that plaintiff had met the requirement of Rule 23(a)(4) that plaintiff will fairly represent the class. After further review, however, the Court is compelled to amend these rulings. First, the Court is persuaded by the path taken by other courts within the Tenth Circuit as they have held that the predominance requirement of Rule 23(b) subsumes the commonality standard under Rule 23(a)(2). *See Harding v. Tambrands, Inc.,* 165 F.R.D. 623, 627 (D.Kan.1996); *Sollenbarger v. Mountain States Tel. and Tel. Co.,* 121 F.R.D. 417, 423 (D.N.M.1988). *See also* 7A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 1763 at 227 (2d ed.1986). This practical approach is justified because the predominance requirement is a more stringent standard than the commonality test, though both concern the same issues. *Id.* Therefore instead of concluding that the commonality requirement has been established by plaintiff, the Court will consider this issue within the analysis of whether common questions predominate over individual issues. Second, the Rule 23(a) requirement of typicality and the requirement of Rule 23(a)(4) that the representative must adequately represent the class are interrelated. A number of courts have convincingly ruled that " 'if the representative claims are not typical of the class, they cannot adequately protect the interests of the absent class

members.' " *Sollenbarger,* 121 F.R.D. at 423–24 (citing *Spivak v. Petro–Lewis Corp.,* 118 F.R.D. 504, 509–10 (D.Col.1987)); *see also Harding,* 165 F.R.D. at 628. Therefore, pending this Court's ruling on typicality, the Court will reconsider its earlier announced ruling on the sufficiency of plaintiff's assertions regarding the adequacy of representation. Although these modifications change the approach to the problem at hand, they do not change the centrality of the issues upon which the Court requested supplemental briefing.

## II. *Discussion*

Although the Court has narrowed the issues in this matter, the general approach to class certification remains the same. In any review of an application for class certification the Court is not to consider the merits of plaintiff's claims, but is to conduct a "rigorous analysis" which may involve considerations " 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' " *General Telephone Company of the Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982) (quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 2459, 57 L.Ed.2d 351 (1978)). Likewise, "[w]hether a case should be allowed to proceed as a class action involves intensely practical considerations, most of which are purely factual or fact-intensive." *Reed v. Bowen,* 849 F.2d 1307, 1309–10 (10th Cir.1988) (citing *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980)). In addressing these considerations, the decision to grant or deny class certification is a matter within this Court's discretion. *Id.* Notwithstanding the fact that courts of this Circuit have "erred in favor of certification since the decision is not set in stone, but is subject to later modification," *Edgington v. R.G. Dickinson & Co.,* 139 F.R.D. 183, 188 (D.Kan.1991) (citing *Esplin v. Hirschi,* 402 F.2d 94, 99 (10th Cir.1968)), plaintiff is "under a strict burden of proof, that all the requirements of [Rule 23] are clearly met." *Rex v. Owens,* 585 F.2d 432, 435 (10th Cir. 1978).

Plaintiff in the present action represents his own claims as consisting of allegations that SWBT "violated the federal antitrust laws and state common law by engaging in deceptive and misleading solicitations, marketing and sales techniques to induce Oklahoma customers into purchasing ... IWMS." (Pl. Supp. Br. at 1). From this representation, as well as a review of plaintiff's complaint, it is clear that the central issue in all of plaintiff's legal theories of relief is the nature of defendant's communication with its customers regarding IWMS.

■ The two remaining issues before the Court on plaintiff's motion are whether the typicality requirement of Rule 23(a)(3) is fulfilled by plaintiff's assertions, and whether plaintiff has met the commonality requirements of Rule 23(a)(2) and Rule 23(b)(3). The United States Supreme Court has noted that the typicality and commonality requirement of Rule 23(a) tend to merge as "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 156 n. 13, 102 S.Ct. at 2370 n. 13. However, in the present case, plaintiff has proposed class certification under Rule 23(b)(3) which requires that common issues predominate over issues affecting only individual members. Therefore, as the predominance issue appears to be the most stringent standard plaintiff must meet before this Court may order certification, the Court will address that issue first.

■ In the Tenth Circuit, the proper test for the predominance standard is whether or not plaintiff's claims stem from "a common nucleus of facts" or from "a common course of conduct." *Esplin*, 402 F.2d at 98; *see Sollenbarger*, 121 F.R.D. at 433. As plaintiff's claims center around assertions of misrepresentations, the district court in *Sollenbarger* correctly notes that the Advisory Committee notes to Rule 23 are also helpful in the Court's decision:

(A) fraud perpetrated on numerous persons by the use of similar misrepresenta-

tions may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class. On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.

121 F.R.D. at 433 (citing explanation of Advisory Committee of 1966, 39 F.R.D. 69, 103 (1966)). In addition, the language of Rule 23(b) is undeniable that whatever common issues exist they must at least somewhat outweigh the concern with individual issues before a class can be certified.

In the Memorandum Opinion and Order of July 26, 1996, the Court ruled that after a review of prior similar cases involving class certification, the central distinction between those cases which granted certification from those cases which did not grant certification was the existence of a negative option contract or a scripted solicitation. *See Davis v. Southern Bell Tel. & Tel.*, 158 F.R.D. 173, 176–77 (S.D.Fla.1994) (certification of class proper where substance of representations in script were not varied); *Strong v. Bellsouth Telecommunications, Inc.*, No. 93–0999 (W.D.La. Jan. 24, 1994) (consumers confronted with numerous different opportunities to select IWMS with no negative option contract made claims too disparate); *Sollenbarger*, 121 F.R.D. at 432–34 (where company employed negative option contract to maintain IWMS customers typicality and commonality were present).

### A. *Negative Option Contract*

Although it does not conclude the inquiry, it is first important to note that plaintiff has failed to identify a negative option contract as identified in the cases cited above. In his supplemental briefing, plaintiff retreats from the assertions in his Motion for Class Certification that SWBT has enlisted customers in its program in a negative option contract by automatically signing people up for the program unless they affirmatively acted to decline participation in the program. (Pl.

Supp. Br. at 5–9). Instead, plaintiff asserts SWBT engaged in four different types of conduct that constituted negative option contracts.

First, plaintiff argues that SWBT's failure to unbundle IWMS prior to 1987 was, in effect, a negative option contract. However, it is clear from the pleadings that, contrary to plaintiff's assertions, IWMS was not deregulated in Oklahoma until 1987, but was still the responsibility of SWBT under the prior regulatory scheme. *See Sollenbarger*, 121 F.R.D. at 420 (from 1982–1987 states were given the authority to regulate IWMS). What is clear from plaintiff's own exhibits is that the Corporation Commission of the State of Oklahoma chose not to deregulate IWMS until 1987. (Pl.Supp.Br., Ex. 1). Although the Court does not now decide whether plaintiff's claims regarding IWMS prior to 1987 are meritorious, there can be no doubt that SWBT did not engage in an "opt out" type of contract as the Court referenced when requesting additional briefing.

Second, plaintiff alleges that the balloting procedures employed by SWBT in its initial efforts to sign up customers for its InLine and InLine Plus plans were negative option contracts. Once again, the Court makes no determination whether such plans constituted fraudulent misrepresentations or violations of the Sherman Act. What is clear is that the customers were not confronted with a negative option contract by which they had to affirmatively act to decline service. Instead, the customers were only connected to the service if they returned the ballots requesting connection. (Pl.Supp.Br., Exs. 4–6).

Third, plaintiff suggests that price increases were themselves negative option contracts. Without commenting on whether SWBT's price increases may have been done in a fraudulent manner or illicitly concealed, the Court does not find them to constitute either a claim presented in plaintiff's complaint, or a negative option contract. Any other finding would equate the issue raised in the complaint regarding connection of service with the price increases that plaintiff does not assert as a basis for SWBT's liability, but raises as the results of wrongful conduct. (Compl. ¶ 29, p. 9–10).

Fourth, plaintiff identifies the allegedly deceptive sales techniques employed by SWBT as negative option contracts. Plaintiff here merely argues the merits of his case that through oral or written solicitations SWBT misled and defrauded the putative class. Individual instances of SWBT representatives failing to disconnect service upon request or to alert customers to the optional nature of IWMS do not assert a class-wide claim that SWBT customers had IWMS added to their service unless they affirmatively declined. Though these claims may prove true, they do not constitute a negative option contract similar to that upon which the Court requested supplemental briefing.

Equally important as the Court's finding that plaintiff has not proven the existence of a negative option contract is the fact that in cases such as *Sollenbarger*, the entire putative class had been subject to the telephone provider's negative option contracts. Even if the Court were to find that one of plaintiff's allegations did constitute a negative option contract, it would not justify certification of plaintiff's proposed class, but only a small subclass of that suggested in the complaint. In other words, none of the above proposals identify an issue common to all putative class members. Although it is not necessary that all class members' cases involve identical facts, it is necessary that there be a core of similar facts or common nucleus of operative facts. The negative option contracts advanced by plaintiff identify situations that are far too disparately applicable to the putative class for this Court to find that plaintiff has carried his burden to prove that common issues of law or fact predominate over individual issues.

### B. Uniform or Scripted Marketing Techniques

The Court also requested supplemental briefing on whether plaintiff employed uniform or scripted marketing techniques. After a thorough review of the numerous written and oral solicitations undertaken by SWBT, the Court concludes that although many of the solicitations were similar, they were not so similar to overcome the difficulties identified above by the Advisory Com-

mittee regarding cases involving fraud and misrepresentation.

Three questions are presented by this issue. First, how common or similar are the different oral presentations made by SWBT? Second, how common or similar are the written solicitations made by SWBT? Third, how common or similar are the oral presentations to the written solicitations?

Regarding plaintiff's allegation that the oral presentations were scripted or even uniform, plaintiff has failed to carry his strict burden of proof as required in this Circuit. *Rex*, 585 F.2d at 435. Plaintiff identifies recommended sample language created by the SWBT marketing department, (Pl.Supp. Br., Ex. 13), but fails to identify the deposition testimony of witnesses or any documents which support the idea that this language was employed by those making sales calls on behalf of SWBT. In fact, the only two witnesses who discuss the sample language say unequivocally that the language was not to be used as a script, but only as a sample or guide. (Def.Supp.Reply, Exs. 2, 9). Plaintiff identifies no actual script as was identified in *Davis* where employees repeat identical mantras to each customer. In fact, plaintiff's exhibit 8 appears to indicate that there were great inconsistencies across the SWBT system regarding representations made to customers. Therefore, consistent with the Advisory Committee's admonition, the Court finds that although the sample verbiage identified by the plaintiff may represent some common core of representations that SWBT representatives may have referenced in their oral solicitations, the plaintiff has failed to assure the Court that there were no material variations in the representations or degrees of reliance by the customers. Although the Court gave plaintiff ample opportunity to conduct discovery regarding class certification, plaintiff chose not to depose, or at least not to present testimony of any individuals who directly observed or were involved in the telemarketing of IWMS. Moreover, plaintiff does not address defendant's identification of at least fifteen different channels by which

defendant made oral sales contacts with customers, nor what percentage of IWMS users have been connected through the different channels. Before the Court can identify which issues are predominant among class members or how the Court could fashion subclasses for the obvious number of customers that were exposed to different marketing techniques, it is necessary to have some idea what issues will come to form the primary basis of the litigation. Plaintiff's pleadings to date do not provide such information.

Next, plaintiff argues that the written materials presented to customers have uniform faults which would justify this Court in certifying the class. Plaintiff is correct that the representations made to customers in 1986 and 1987 contained virtually identical information. However, plaintiff's putative class covers a period of ten to fourteen years.[1] In that period, numerous written contacts were made by SWBT to its customers regarding the IWMS service; these included not merely the ballots upon which plaintiff concentrates, but also the numerous documents identified by both plaintiff and defendant in their supplemental briefings. (Pl. Supp. Br., Ex. 12; Def. Supp. Br., Exs. 9, 10; Def. Supp. Reply, Ex. 4). These exhibits identify independent direct mail pieces, inserts placed in customers' bills, advertisements available at sales centers or SWBT kiosks, and information provided in the SWBT phone books.

Although the core representation in all of these documents remains the same, *i.e.* In-Line and especially InLine Plus can save you money and prevent possibly high repair bills, the disclaimers and limitations vary greatly throughout the relevant time period with the appearance of increasing limitations and disclosures as time progressed. The substantive difference in the disclaimers and the timing of a putative class member's decision to be connected would require the Court to identify countless subclasses because the core nature of plaintiff's claim—misrepresentation and fraud—would preclude a plaintiff from claiming reliance on representations in

---

1. Although plaintiff's proposed class would extend from 1983 to 1997, because no representations were made between 1983 and late 1986, the Court, as a practical matter, considers the time period under consideration as being from 1987 to 1997—a period more closely approximating ten years.

earlier documents that contained fewer disclosures. Likewise, the legal sufficiency of a certain document to support a claim of fraud would differ, most probably depending on when it was created along the timeline of the putative class. These considerations compel the Court to find that plaintiff's arguments regarding the written representations of SWBT do not demonstrate that common issues predominate.

Moreover, although the Court has found that SWBT's written representations possessed more common features than did its oral representations, the Court is persuaded by defendant's arguments that the oral presentations are more important to plaintiff's claims than the written materials. Defendant has established to the Court's satisfaction that the two most common pieces of written material were the least effective and, in fact, solicited the fewest enrollments to IWMS. Although defendant could not establish exactly how many customers signed up during the initial sales push which included the ballots and telephone sales, that effort reveals that it resulted in only thirteen percent of eligible customers being enrolled by the spring of 1987. (Cook Aff., Ex. 4). Likewise, the only evidence of the success of the second ballot effort reveals only a few enrollments. (Olano Dep., p. 81, Ex. 2). In addition, plaintiff does not contest defendant's assertion that "the vast majority of customers have enrolled in the Plans only as a result of individual contacts with SWBT representatives," and the numerous avenues for these contacts supports the conclusion that individual issues of reliance and exactly what representations were made predominate over common issues. (Def. Supp. Br. at 3). Therefore, the Court also finds that plaintiff's allegations regarding the uniformity of SWBT's representations are insufficient to support class certification.

### C. *Sherman Act Violations*

■ Although the Court is confident that the above rulings sufficiently address plaintiff's state law claims, plaintiff's Sherman Act claims require additional attention. Once again, it is the plaintiff's burden to convince the Court that his claims assert a common or core set of facts which apply to all of the putative class members. Plaintiff asserts that defendant's marketing and solicitation of IWMS violated section 2 of the Sherman Act constituting monopolization or an attempt to monopolize. Before plaintiff can prevail on his monopolization or attempt claim, he must show that SWBT "had the 'possession of monopoly power in the relevant market' and 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *City of Chanute v. Williams Natural Gas Co.*, 955 F.2d 641, 654 (10th Cir.1992) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966)).

Clearly the issues of market power and relevant market will be common to all class members. In addition, however, plaintiff must prove that defendant's marketing techniques rose to the level of "willful maintenance [or attempt to gain] monopoly power." *City of Chanute*, 955 F.2d at 655.[2] Although the Tenth Circuit has stated that the gravamen of the conduct requirement is intent, *City of Chanute*, 955 F.2d at 654–655, it has also stated that "[t]he exclusionary conduct must appear reasonably capable of contributing significantly to creating or maintaining monopoly power." *Id.* at 655. Likewise, the Tenth Circuit has ruled that "[i]ntending the natural consequences of acts that are lawful does not constitute the 'exlusionary intent' required to find a § 2 violation." *Id.* From these standards, it is apparent that plaintiff will have to rebut defendant's assertions that its conduct was a natural result of lawful conduct or prove that SWBT's actions were an "abnormal response to market opportunities." *See id.* In other words, the issues of fraud and misrepresentation will continue to be central in the antitrust claims as well. This Court might be willing to indulge plain-

---

**2.** The primary difference between the conduct necessary to constitute monopolization and an attempt to monopolize as identified by the Tenth Circuit is that conduct sufficient for monopoliza- tion need only be accompanied by general intent while the offense of attempt to monopolize requires proof of specific intent. *Bright v. Moss*, 824 F.2d 819, 823 (10th Cir.1987).

tiff's motion for class certification if he had shown that SWBT's actions over the ten to fourteen year period were so interrelated or similar as to constitute a common course of conduct. However, as identified above, in order to identify the lawfulness of plaintiff's misrepresentation claims the Court would have to probe a preponderance of individual issues regarding individual plaintiffs or, at least, numerous discrete subclasses. Thus, plaintiff's antitrust violations fall victim to the same deficiencies as his state common law claims.

Moreover, plaintiff's claim of monopolization will require the factfinder to probe the general intent of SWBT as it conducted its marketing programs.[3] However, this intent is measured by a response to certain "market opportunities." What is clear regarding plaintiff's proposed class is that the market opportunities confronted by SWBT prior to 1987, immediately following deregulation in 1987, and through the present time are additional disparate considerations which further divide the commonality of interests of putative class members.

In sum, plaintiff's monopolization and attempt to monopolize claims suffer from similar deficiencies to his state law claims. The necessary inquiry into the fraudulent or misleading nature of the vastly different solicitations conducted by SWBT combine with numerous variations along the ten to fourteen year period in which potential plaintiffs chose the IWMS option to establish a putative class with individual members who have been confronted with far too disparate circumstances to justify class certification.

### III. *Conclusion*

Of the earlier IWMS cases in which courts have been confronted with class certification issues, the factual posture of the present case closely resembles the facts presented to the United States District Court for the Western District of Louisiana in *Strong v. Bellsouth Telecommunications*, No. 93–0999 (W.D.La. Jan. 24, 1994). In that case, Judge Little concluded:

While we recognize that varying fact situations among class members may not necessarily preclude certification so long as the claims of all the class members are based on the same legal or remedial theory, we find that the bases of the plaintiff[']s claims are too disparate. On this point, we find ... that the plaintiffs vary greatly in the ways by which they became class members.... Were this [C]ourt to indulge the plaintiffs' chameleon-like assertions ..., the resulting class [and subclasses] would be a confusing and technicolor event.

*Id.* at 5, 6. The characterization of the facts and the holding in *Strong* are equally applicable to the instant action.

The foregoing considered, plaintiff's motion for class certification is denied.

---

**3.** If plaintiff cannot certify his monopolization claim which requires only general intent, the Court finds that the more rigid and fact specific inquiry into specific intent regarding his attempt to monopolize claim is not necessary.